**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X

PETER BRIMELOW,

                                                              Index No. _____

                    Plaintiff,

        -against-

                                                      **COMPLAINT**

NEW YORK TIMES COMPANY,

                    Defendant.

-------------------------------------------------------------------X

Plaintiff, by and through his attorney Frederick C. Kelly, Esq., allege the following:

1.      At all times hereinafter mentioned, the Plaintiff Peter Brimelow is a natural person
        residing in Connecticut.

2.      Plaintiff has had a long and distinguished career as a writer and journalist.   He was a
        business writer and editor at the "Financial Post," "Maclean's," "Barron's," "Fortune,"
        "Forbes" (where he attained the position of senior editor), and "National Review"; and
        his book Alien Nation: Common Sense About America's Immigration Disaster was a
        bestseller.

3.      Upon information and belief, at all times hereinafter mentioned, the Defendant, New
        York Times Company, was and still is a foreign limited company, organized and existing
        under the laws of the State of Delaware, but transacting business in the State of New

Page -1-

York and having a principal place of business at 620 Eighth Avenue, New York, NY

10018.


## JURISDICTION & VENUE

4.     This Court has diversity of citizenship jurisdiction pursuant to 28 U.S.C. § 1332.

Plaintiff is a citizen of Connecticut; Defendant is a citizen of New York or Delaware for

purposes of this inquiry.  The amount in controversy exceeds $75,000, exclusive of

interest and costs.  Venue is proper under 28 U.S.C. § 1391(b)

5.     This Court has personal jurisdiction over the Defendant.  Facts supporting jurisdiction

include, most prominently, Defendant's transacting of business in the State of New York

and having a principal place of business at 620 Eighth Avenue, New York, NY 10018, as

well as extensive publication and circulation of *The New York Times* within New York

State.  Venue is proper under 28 U.S.C. § 1391(b) in light of the above.

6.     Therefore, this Court's exercise of personal jurisdiction over the Defendants comports

with Constitutional due process standards. As described in the prior paragraph, the

Defendant has purposefully established sufficient minimum contacts with New York such

that it should reasonably anticipate being haled into court in New York.  Moreover, the

assertion of personal jurisdiction is reasonable and consistent with traditional notions of

fair play and substantial justice.

THE PARTIES & BACKGROUND – THE RECITATION OF WHICH IS SOMEWHAT

LABORIOUS IN LIGHT OF "*NEW YORK TIMES v SULLIVAN*" AND ITS PROGENY

7.    Since 1999, Plaintiff has run the website "Vdare.com," a forum site that publishes writers of all political persuasions, so long as they are critical of America's post-1965 immigration policies. Over a score of years, Plaintiff, through "Vdare.com" has overseen the publication of data, analysis, and editorial commentary from a wide variety of writers of every race, religion, nationality and political affiliation.

8.    The Defendant New York Times Company, has, for over a hundred years, published a newspaper, *The New York Times.*

9.    Under Defendant, *The New York Times* has become what is widely regarded as the most prestigious and trusted newspaper in the United States.

10.    Under Defendant, *The New York Times* has committed itself to fairness and impartiality, for which admirable traits it has historically been known and which have contributed strongly to the prestige and trust with which *The New York Times* has been regarded.

11.    Indeed, the Defendant publishes a manual of both style and journalistic ethics known as The New York Times Manual on Style and Usage.

12.    Upon information and belief, said manual has set the Defendant's rules for *The New York Times* for more than a century.

13.    Upon information and belief, said manual confirms and reaffirms Defendant' commitment to the fairness and impartiality which have earned *The New York Times* the trust and prestige of a large part of the American public.

14.    Upon information and belief, said manual holds that:

"Fairness and impartiality... should be the hallmark of all news articles and
news analyses that appear in the Times. It is of paramount importance that
people or organizations accused, criticized or otherwise cast in a bad light have
an opportunity to speak in their own defense... Thus it is imperative that the
reporter make every effort to reach the accused … If it is not possible to do so,
the article should say that the effort was made and explain why it did not
succeed."

15.    Another aspect of Defendant's longstanding commitment to fairness and impartiality has

been its attempt to avoid the use of anonymous sources wherever possible.

16.    Upon information and belief, said manual holds that the best source for readers is one

who can be identified by name, but also describes when anonymous sources can be used.

The decision must be justified by a reporter and editor who agree that "not only is there

no other way to obtain the information, but also that the information is both factual and

important."  This is because Defendant has historically expected it reporters and editors

to, in effect, vouch for the sources' claims before publication of any news or news

analysis.

17.    Upon information and belief, said manual also holds that anonymous sources are not

permitted to make derogatory statements about someone.

18.    Another hallmark of Defendant's commitment to fairness and impartiality has been its

well known and longstanding prohibition, in contrast to other newspapers, of any

admixture of news, on the one hand, and opinion or editorializing, on the other.

19.    Indeed, Defendant has rigidly committed itself to keeping news and opinion separate, so

much so that the separation was long known internally at *The New York Times* as the

"separation of church and state."

20.    In what is yet another attempt to induce the trust of readers, the Defendant has set a policy

of promptly correcting all factual errors called to its attention in a prominent space

specially reserved for such corrections in the paper:

> "Because its voice is loud and far-reaching, The Times recognizes an ethical
> responsibility to correct all its factual errors, large and small (even misspellings
> of names), promptly and in a prominent reserved space in the paper... Whether
> an error occurs in a print article, a digital graphic, a video, a tweet or a news
> alert, readers should expect us to correct it. There is no five-second rule. It does
> not matter if it was online for seconds or minutes or hours."

21.    Indeed, the Defendant publicly informs its readers and acknowledges its ethical obligation

to make prompt corrections by explicitly proclaiming the above policy.

22.    Upon information and belief, Defendant understands that its commitment to fairness and

impartiality, its commitment to reaching out to men or organizations which are being

criticized or otherwise cast in a bad light, its commitment to "the separation of church and

state," and its policy of making prompt and public corrections, induce a sense of trust in

readers and contribute to the prestige of *The New York Times*; and in fact are designed, in

part, to earn that trust and garner that prestige.

23.    Upon information and belief, Defendant is also committed to uninhibited, robust and

wide open debate on all topics and proudly acknowledges that it was the beneficiary of

one of the landmark cases of modern First Amendment jurisprudence, to wit, *New York

Times Co. v. Sullivan*, 376 US 254 (1964).

24.    Upon information and belief, Defendant also understands that the privilege and license of

a free press are meant to serve the larger issue of free speech and free inquiry, as in the

*New York Times Co. v. Sullivan* decision.

25.    Upon information and belief, Defendant understands that, ironically, speech can have a

silencing effect that chills debate, especially where speech is used to enforce taboos or

engage in *ad hominem* attacks by questioning the motives or character of men who pursue

taboo subjects, or stray from perceived orthodoxy.

26.    Defendant understand that the subjects of race and racial differences are subject to some

of the most heavily fraught taboos in contemporary American society.

27.    And Defendant has explicitly acknowledged such.  For example, on or about September

17, 2002, Defendant published an article entitled "In Nature vs. Nurture, a Voice for

Nature" which stated in relevant part:

> "Who should define human nature? When the biologist Edward O. Wilson set
> out to do so in his 1975 book 'Sociobiology,' he was assailed by left-wing
> colleagues who portrayed his description of genetically shaped human
> behaviors as a threat to the political principles of equal rights and a just society.
> *"Since then, a storm has threatened anyone who prominently asserts that*
> *politically sensitive aspects of human nature might be molded by the genes. So*
> *biologists, despite their increasing knowledge from the decoding of the human*
> *genome and other advances, are still distinctly reluctant to challenge the*
> *notion that human behavior is largely shaped by environment and culture. The*
> *role of genes in shaping differences between individuals or sexes or races has*
> *become a matter of touchiness, even taboo.*
> *"A determined effort to break this silence and make it safer for biologists to*
> *discuss what they know about the genetics of human nature has now been*
> *begun by Dr. Steven Pinker, a psychologist of language at the Massachusetts*
> *Institute of Technology*.  (emphasis added)

28.    Indeed, with well known examples, hitting everyone from low and vulgar types, such as

former NBA Clippers owner Donald Sterling, to eminent and distinguished gentlemen,

such as Nobel Prize Winner James Watson,  Defendant is certainly aware of a number of

salient examples of how free speech and free inquiry can be punished – and thereby

confined – when the unorthodox are made to disavow and walk back prior inquiries, or

even off hand remarks.

29.     Defendant is thus acutely aware of the silencing power of speech and the way in which

otherwise robust debate can be confined by *ad hominem* attacks on the character of men

who stray to the edge, or beyond the edge, of conventional debate.

30.     But consistent with its commitment to free speech, Defendant itself has in the past

bravely pushed the boundaries of the taboos on race.  For example:

   a.     On or about July 20, 2001, Defendant published in *The New York Times* an article

          entitled "Genome Mappers Navigate the Tricky Terrain of Race," which stated in

          relevant part:

               "Scientists planning the next phase of the human genome project are
               being forced to confront a treacherous issue: the genetic differences
               between human races."

   b.     On or about November 5, 2001, Defendant published in *The New York Times* an

          article entitled "Study Finds Genetic Link Between Intelligence and Size of Some

          Regions of the Brain" which stated in relevant part:

               "Lunging into the roiled waters of human intelligence and its
               heritability, brain scientists say they have found that the size of certain
               regions of the brain is under tight genetic control and that the larger
               these regions are the higher is intelligence."

   c.     On or about July 30, 2002, Defendant published in *The New York Times* an article

          entitled "Race Is Seen as Real Guide to Track Roots of Disease", which stated in

relevant part:

> "Challenging the widely held view that race is a 'biologically meaningless' concept, a leading population geneticist says that race is helpful for understanding ethnic differences in disease and response to drugs. The geneticist, Dr. Neil Risch of Stanford University, says that genetic differences have arisen among people living on different continents and that race, referring to geographically based ancestry, is a valid way of categorizing these differences."

d.    On or about Oct 8, 2002, Defendant published in *The New York Times* an article entitled "A New Look at Old Data May Discredit a Theory on Race," which stated in relevant part:

> "Two physical anthropologists have reanalyzed data gathered by Franz Boas, a founder of American anthropology, and report that he erred in saying environment influenced human head shape. Boas's data, the two scientists say, show almost no such effect. The reanalysis bears on whether craniometrics, the measurement of skull shape, can validly identify ethnic origin…"

e.    On or about December 24, 2002, Defendant published in *The New York Times* an article entitled "The Palette of Humankind", which stated in relevant part:

> "Humankind falls into five continental groups - broadly equivalent to the common conception of races - when a computer is asked to sort DNA data from people from around the world into clusters."

f.    On or about December 20, 2002, Defendant published in *The New York Times* an article entitled "Gene Study Identifies 5 Main Human Populations", which stated in relevant part:

> "Scientists studying the DNA of 52 human groups from around the world have concluded that people belong to five principal groups corresponding to the major geographical regions of the world: Africa,

Europe, Asia, Melanesia and the Americas. The study, based on scans of the whole human genome, is the most thorough to look for patterns corresponding to major geographical regions. These regions broadly correspond with popular notions of race, the researchers said in interviews."

g.      On or about March 20, 2003, Defendant published in *The New York Times* an article entitled "2 Scholarly Articles Diverge on Role of Race in Medicine," which stated in relevant part:

"A view widespread among many social scientists, endorsed in official statements by the American Sociological Association and the American Anthropological Association, is that race is not a valid biological concept. But biologists, particularly the population geneticists who study genetic variation, have found that there is a structure in the human population. The structure is a family tree showing separate branches for Africans, Caucasians (Europe, the Middle East and the Indian subcontinent), East Asians, Pacific Islanders and American Indians....Biologists, too, have often been reluctant to use the term 'race.' But this taboo was broken last year by Dr. Neil Risch, a leading population geneticist at Stanford University. Vexed by an editorial in The New England Journal that declared that race was 'biologically meaningless,' Dr. Risch argued in the electronic journal Genome Biology that self-identified race was useful in understanding ethnic differences in disease and in the response to drugs."

31.   In apparent opposition to the Defendant, and in stark contrast to Defendant's purported commitment to

a.      fairness and impartiality,

b.      refraining from unfairly casting men in a bad light,

c.      avoiding anonymous sources,

d.      "the separation of church and state;" and

e. the prompt policy of make public corrections prominently,

is the Southern Poverty Law Center (the "SPLC").

32. The SPLC is a disreputable organization known by the Defendant to be highly questionable as a source of information.

33. The SPLC was exposed in the *Montgomery Advertiser*, decades ago in 1994, as a fundraising scam which deliberately falsifies and inflates the threat of subjectively defined "hate" in order to bilk gullible donors and thereby bring in enough money to fund high salaries for its executive officers.

34. Upon information and belief, the Defendant took notice of the *Montgomery Advertiser* expose when published, and certainly no later than May 12, 1996.

35. The SPLC is not committed to fairness and impartiality, but is openly partisan; and is known to be openly partisan by Defendant.

36. More than that, the SPLC is – in opposition to uninhibited, robust, and wide open debate – committed to persecuting men for holding unorthodox opinions.

37. Thus, in 2008, Mark Potok, an SPLC operative associated with a project that spies on men for holding unorthodox opinions, stated the following regarding the SPLC's work:

> "Our criteria for a hate group, first of all, have nothing to do with criminality, or violence, or any kind of guess we're making about 'this group could be dangerous.' It's strictly ideological."

and

> "We see this political struggle, right? …I mean, we're not trying to change anybody's mind. We're trying to wreck the groups, and we are very clear in our head, this is[sic]… we are trying to destroy them. Not to send them to prison unfairly or not take their free speech rights away… but as a political matter, to destroy them."

38.   Upon information and belief, the Defendant took notice of the SPLC's admissions no
      later than 2008, while the general public remained oblivious to the fact that the SPLC's
      definition of "hate" is itself highly biased and subjective, certainly through January 15,
      2019 when publication(s) at issue herein were made.

39.   Going well beyond mere anonymous sources, the SPLC makes broad use of a network or
      unscrupulous men who spy on fellow citizens, not, as Potok admitted above, for being
      dangerous or criminal, but merely for holding unorthodox opinions.  Upon information
      and belief, the Defendant readily understands this.

40.   Regrettably, Defendant has conceived of a plan to target Plaintiff and intentionally
      defame him, in the process violating its long held standards of conduct where Plaintif is
      concerned, even as it leverages the prestige and trust gathered to it over many years to
      increase the sting of defamation against Plaintiff.


                          FIRST CAUSE OF ACTION

41.   Thus, on or about January 15, 2019, the Defendant New York Times Company did falsely
      and maliciously publish in *The New York Times*, online and in electronic format, an
      article entitled "A Timeline of Steve King's Racist Remarks and Divisive Actions"
      concerning the Plaintiff, hereafter "the Online Article."

42.   The very next day, the Defendant New York Times Company did falsely and maliciously
      publish in *The New York Times*, in print or paper format, the same or substantially same

version of the Online Article, at Section A, Page 14 of the New York edition, but with a

different headline, to wit "On the Record: Incendiary Remarks and Divisive Actions",

hereafter, the "Print Article."

43. By means of both the Online Article and the Print Article, the Defendant published false

and defamatory matter which accused Plaintiff Brimelow of being an "open white

nationalist."

44. The aforesaid the Online Article and the Print Article contained false and defamatory

matter wherein it stated:

    a.    "2012.  "On a panel at the Conservative Political Action Conference with Peter

        Brimelow, an open white nationalist...

45. The statements referenced in Paragraph 44(a) above were and are false and untrue.

46. The statements referenced in Paragraph 44(a) above referred to the Plaintiff.

47. The statements referenced in Paragraph 44(a) above were published by the Defendant and

widely read and discussed by the public at large.  Indeed, the statements referenced in

Paragraph 44(a) above were circulated widely and quickly.  For example, amongst other

places, the smear about Plaintiff being "an open white nationalist" was carried into the

Congressional Record by Representative Bobby Rush in the days after publication.

48. The statements referenced in Paragraph 44(a) above were published by the Defendant

    a.    without seeking corroboration from the most obvious source, *viz*. Plaintiff

        Brimelow, who did and does deny being a white nationalist, let alone an "open

        white nationalist."  Thus, the Online Article and the Print Article were published

in egregious deviation from accepted newsgathering standards and in extreme

departure from of Defendant's own commitment to fairness and impartiality and

against its policy of affording a man the opportunity to speak in his own defense.

b.    without seeking corroboration from another obvious source, to wit, Plaintiff's

website, "Vdare.com" which explicitly claims and claimed prior to January 15,

2019, that neither it, nor Plaintiff, is "white nationalist."

c.    in apparent reliance on a highly questionable source with a reputation for

persistent inaccuracies, namely the SPLC, which source Defendant has known to

be highly questionable well before publication on January 15, 2019.

d.    with preconceived hostility toward Plaintiff as an ideological opponent.

e.    in the face of repeated and persistent denials, as will be seen.


49.    Plaintiff called Defendant's attention to the defamatory material in a letter from his

attorney dated January 17, 2019, which was received by Defendant on January 17, 2019.

50.    In said January 17, 2019 letter, Plaintiff explained that:

> "Mr. Brimelow is not a 'white nationalist' and, specifically, does not refer to
> himself as such. To the contrary, he has repeatedly said that he is a 'civic
> nationalist.' For example, in a February 23, 2018 interview with Slate's Osita
> Nwanevu, Mr. Brimelow stated as follows: 'Personally, I would regard myself
> as a civic nationalist.'"

51.    In the same January 17, 2019 letter, Plaintiff explained, with unimpeachable logic, that:

> "The fact that VDARE has published some critiques of America's immigration
> policies from those who aim to defend the interests of whites does not mean
> that Mr. Brimelow is an 'open white nationalist,' any more than the New York
> Times's decision to publish op-eds by avowed socialists makes it 'openly

socialist.'"

Then, too, the letter made the point that:

> "The website that Mr. Brimelow edits, VDARE.com, is a forum site that
> publishes writers of all political persuasions, so long as they are critical of
> America's post-1965 immigration policies. Over the course of nearly 20 years,
> VDARE has published data, analysis and editorial commentary from a wide
> variety of writers of every race, religion, nationality and political affiliation."

52.     Defendant responded by continuing to breach their own ethics and standards in what

became an increasingly clear pattern of malice, both "common law" malice and "*New

York Times v Sullivan*" malice.

53.     Thus, in tacit acknowledgment of its error, Defendant partially corrected the Online

Article by removing the adjective "open" from its description of Plaintiff.

54.     However, as stated above, Defendant has a publicly avowed policy of making corrections

promptly, explicitly and in a prominent reserved space, as per its stated policy.

55.     But Defendant, because of its malice toward Plaintiff, refused to apply its own policy

toward Plaintiff.   Instead, it made an unacknowledged edit (or "stealth edit") in the

Online Article and refused to make even this measly correction promptly, explicitly and

in a prominent reserved space.

56.     And Defendant continued to label Plaintiff a "white nationalist."

57.     More than that, Defendant aggravated its original defamation and continued with its

pattern of ill will and malice toward Plaintiff by adding a hyperlink to the term "white

nationalist" in its Online Article, which linked to a smear piece by the SPLC.  That link

can be found here:

htttps://www.splcenter.org/fighting-hate/extremist-files/individual/peter-brimelow

58. The link, found under the SPLC's "fighting-hate" and "extremist-files," accuses Plaintiff of hate and states, among other things, that Plaintiff is a "white nationalist" who allegedly "warns America of pollution by Catholics" (a false allegation which is truly an absurdity given that both Brimelowe's wives were Catholics and several of his children were and are being raised Catholic)  and castigates Plaintiff for publishing articles on the science of racial differences in the words "VDARE.com posts... defenders of The Bell Curve — a highly controversial book arguing that whites are more intelligent than blacks — like Steve Sailer."   Furthermore, there is material on the SPLC website that makes clear that the SPLC categorizes Plaintiff under the "hate" category because of his publication of science dealing with racial differences, of which material the Defendant is aware.

59. Defendant was thus endorsing and vouching for the accuracy of the SPLC smear in a news article and asserting as a fact that its readers could rely on the SPLC definition of "hate" as a fact, despite knowing that the SPLC is itself a partisan and unreliable source, which utilizes subjective definitions of "hate" with the aim of suppressing free speech and confining debate.

60. Furthermore, it was knowingly false – and grossly hypocritical – for the Defendant to join in the SPLC condemnation of Plaintiff has a hate filled white nationalist based upon his publication of articles on the science of racial differences, when the Defendant both knew and knows full well that it had itself has published numerous articles on the science of racial differences, as set forth at Paragraph 30 above.

61. Indeed, the author of most or all of the above articles at Paragraph 30 was well respected

science author Nicholas Wade.

62.    But Mr. Wade, too, came in for condemnation by the SPLC for writing about the science

of race differences in an article published by the SPLC on May 28, 2014 (which is, of

course, additional proof of the charge, leveled decades ago and well understood and

confirmed by the Defendant, that the SPLC is an unreliable source, a money raising scam

mean to bilk gullible people by exaggerating the threat of "hate").

63.    Upon information and belief, Defendant was well aware of the SPLC's denunciation of

Mr. Wade on May 28, 2014, well before Defendant agreed to endorse and publish the

smear of Plaintiff on January 15, 2019.

64.    Nevertheless, Defendant knows that it itself is not a purveyor of hate or white nationalism

because it has published articles on the science of racial differences.

65.    Defendant therefore knew, in its "stealth edit" and hyperlink to the Online Article, that it

was false to label Plaintiff a purveyor of hate or white nationalism because he had

overseen the publication of articles on the science of racial differences.

66.    Nevertheless, Defendant endorsed the smear of Plaintiff  in its "stealth edit" and

hyperlink to the Online Article in an act of bad faith and deliberate falsity.

67.    Subsequent letters sent by Plaintiff's attorney on February 15, 2019,  September 27, 2019,

and October 16, 2019 stressed that the Defendant's false and defamatory story had not

been rectified by the "stealth edit" (which was itself another deviation from the

Defendant's own standards) and had in some measure been aggravated by Defendant's

endorsement of the SPLC's smear piece.  These letters were received by Defendant on the

above referenced dates by e-mail and, upon information and belief, seen and discussed

internally by Defendant.

68.  Meanwhile, even as the above letters were sent and discussed by Defendant, wherein
     Plaintiff increasingly protested his defamatory smear by Defendant's endorsement of the
     SPLC, it became increasingly clear throughout early 2019 that the SPLC was an even
     worse and disreputable organization than had been know.

69.  One of the criticism made clear by the *Montgomery Advertiser* had been that the SPLC
     was too much the reflection, one might say the shadow, of one particularly dubious man:
     Morris Dees.  Again, this fact was well known to Defendant, whose reporters have
     repeatedly covered the SPLC and checked many stories against the SPLC over the years.

70.  On or about March 14, 2019, Morris Dees was suddenly fired from the SPLC under
     circumstances that suggest both sexual and racial improprieties on his part, which
     improprieties were well enough know to have been referenced by the *Montgomery
     Advertiser* decades ago and, upon information and belief, confirmed by the Defendant
     through its own contacts for many years.

71.  In the days after March 14, 2019, many stories began to surface in the press about the
     hypocrisy and phoniness of the SPLC, including one in *The New Yorker* on March 21,
     2019, by former employee Bob Moser, who noted the SPLC's well documented practice
     of exaggerating hate and recalled "the hyperbolic fund-raising appeals, and the fact that,
     though the center claimed to be effective in fighting extremism, 'hate' always continued
     to be on the rise, more dangerous than ever, with each year's report on hate groups. 'The
     S.P.L.C.—making hate pay,' we'd say."  Particularly colorful was the recollection that the
     SPLC's scam was an all but an open secret.  As the New Yorker article recalled:

"Walking to lunch past the center's Maya Lin–designed memorial to civil-rights martyrs, we'd cast a glance at the inscription from Martin Luther King, Jr., etched into the black marble—'Until justice rolls down like waters'—and intone, in our deepest voices, 'Until justice rolls down like dollars.'"

72.     Upon information and belief, Defendant not only read the *The New Yorker* article by Bob Moser on March 21, 2019, but has, through its own reporters, long known of the truth of the allegations in Moser's article and like facts about the SPLC.

73.     Nevertheless, as the SPLC's troubles began to mount, with first Dees being mysteriously fired, and then SPLC President Cohen suddenly and mysteriously resigning about a week later on March 23, 2019, the utter lack of credibility at the SPLC was apparent to all, even to its apparent ideological allies within Defendant.

74.     But, due to a pre-conceived plan to defame Plaintiff, and animated by malice as aforesaid, Defendant resolutely refused to back down from its categorization of Plaintiff as a "white nationalist" on the word of the SPLC.  Indeed, in yet another deviation from its own policy of fairness and impartiality, Defendant refused to allow Plaintiff to be heard and would not publish a letter to the editor wherein he defended himself.

75.     Similarly, in late 2019 Defendant continued, in what were additional unfair instances of malice and ill will directed against Plaintiff, to refuse to publish an expanded letter by Plaintiff defending himself against a further malice and ill will directed against him in his role of Editor of his website.

76.     The above actions show that both the Online Article and the Print Article were published with actual malice in the Constitutional sense of knowing falsehood or reckless disregard,

and a deliberate attempt to purposefully avoid the truth.  In the alternative, they were published with a lack of ordinary care and a failure to use that degree of care that a reasonable and prudent man would have used under the same circumstances; in further alternative, they were published in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.

77. In the statements referenced in Paragraph 44(a) above, the Defendant imputed to Plaintiff race hatred and traits inconsistent with his profession.

78. The statements referenced in Paragraph 44(a) above exposed the Plaintiff to public hatred, contempt, ridicule, and disgrace, lowered his reputation, and deterred decent people from associating or dealing with him.

79. The Defendant  by the publication of the statements referenced in Paragraph 44(a) above, meant and intended to expose the Plaintiff to public hatred, contempt, ridicule, and disgrace, to lower his reputation, and to deter decent people from associating or dealing with him.

80. By reason of the publication of the statements in Paragraph 44(a) above, Plaintiff has been injured in his good name, fame, credit, profession, and reputation as a man, and in his various public and private positions, callings, and lines of endeavor, and has been held up to public ridicule before his acquaintances and the public, and to suffer the loss of prestige and standing in his community and elsewhere.

81. By reason of the publication of the statements in Paragraph 44(a) above, Plaintiff has suffered special damages in the form of injury and loss of pecuniary opportunities in an

amount of approximately $700,000.

82.     The Defendant was actuated by ill will, malice, conscious disregard of the rights of

others, and were willful and wanton in their publication of the statements referenced in

Paragraph 44(a) above, thereby entitling Plaintiff to punitive damages.


WHEREFORE, Plaintiff demands judgment against Defendant in an amount no less than Five

Million Dollars, together with punitive damages, and the costs and disbursements of this action.


Dated: Goshen, New York          Yours, etc.
       January 9, 2020


                                 /s/ Frederick C. Kelly
                                 Frederick C. Kelly, Esq. (FK1986)
                                 *Attorney for Plaintiff*
                                 One Harriman Square
                                 Goshen, NY 10924
                                 Phone No.: (845) 294-7945
                                 Fax: (845) 294-7889