**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X

PETER BRIMELOW,

                                                 Case 7:20-cv-00222

                   Plaintiff,

     -against-

                                                 **SECOND**
                                                 **AMENDED**
                                                 **COMPLAINT**

NEW YORK TIMES COMPANY,

                   Defendant.

-------------------------------------------------------------------X

Plaintiff, by and through his attorney Frederick C. Kelly, Esq., alleges the following:

1.     At all times hereinafter mentioned, the Plaintiff Peter Brimelow is a natural person residing in Connecticut.

2.     Upon information and belief, at all times hereinafter mentioned, the Defendant, New York Times Company, was and still is a foreign limited company, organized and existing under the laws of the State of Delaware, but transacting business in the State of New York and having a principal place of business at 620 Eighth Avenue, New York, NY 10018.

JURISDICTION & VENUE

3.     This Court has diversity of citizenship jurisdiction pursuant to 28 U.S.C. § 1332. Plaintiff is a citizen of Connecticut; Defendant is a citizen of New York or Delaware for

purposes of this inquiry.  The amount in controversy exceeds $75,000, exclusive of interest and costs.  Venue is proper under 28 U.S.C. § 1391(b)

4.      This Court has personal jurisdiction over the Defendant.  Facts supporting jurisdiction include, most prominently, Defendant's transacting of business in the State of New York and having a principal place of business at 620 Eighth Avenue, New York, NY 10018, as well as extensive publication and circulation of *The New York Times* within New York State.  Venue is proper under 28 U.S.C. § 1391(b) in light of the above.

5.      Therefore, this Court's exercise of personal jurisdiction over the Defendant comports with Constitutional due process standards. As described in the prior paragraph, the Defendant has purposefully established sufficient minimum contacts with New York such that it should reasonably anticipate being haled into court in New York.  Moreover, the assertion of personal jurisdiction is reasonable and consistent with traditional notions of fair play and substantial justice.

## THE PARTIES & BACKGROUND

6.      Plaintiff has had a long and distinguished career as a writer and journalist.   He was a business writer and editor at the "Financial Post," "Maclean's," "Barron's," "Fortune," "Forbes" (where he attained the position of senior editor), and "National Review"; and his book <u>Alien Nation: Common Sense About America's Immigration Disaster</u> was a bestseller.

7.      Indeed, Defendant had implicitly acknowledged the important contribution Brimelow had made to public debate in America with said <u>Alien Nation</u> when Defendant chose to

review <u>Alien Nation</u> not once, but twice within the same week, a practice which Defendant usually reserves only for works it considers especially noteworthy.

8.      Specifically, Defendant reviewed <u>Alien Nation</u> twice between April 16, 1995 and April 19, 1995: Nicholas Lemann, *Too Many Foreigners*, THE NEW YORK TIMES BOOK REVIEW, April 16, 1995, at 3, section 7; and Richard Bernstein, *The Immigration Wave: A Plea to Hold Back*, NEW YORK TIMES, April 19, 1995, at 17, section C.

9.      Neither review detected any kind of race hatred or what the Defendant has lately claimed as "White Nationalism."

10.     However, the second review published by Defendant was especially complimentary. Mr. Brimelow's writing was declared "powerful and elegant." Far from denigrating <u>Alien Nation</u> as "White Nationalist" and "Racist and Divisive," Defendant's review was lavish in its praise of Brimelow's work, stating *inter alia*:

   a.      "Mr. Brimelow's personality also comes through, and it is entirely engaging."

   b.      "...Mr. Brimelow has made a highly cogent presentation of what is going to be the benchmark case against immigration as it is currently taking place. Those who think that the system needs no fixing cannot responsibly hold to that position any longer unless they take Mr. Brimelow's urgent appeal for change into account."

   c.      "The strong racial element in current immigration has made it more than ever before a delicate subject. It is to Mr. Brimelow's credit that he attacks it head on, unapologetically."

11.     Since Christmas Eve, 1999, Plaintiff has run the website "VDARE.com," a forum site

that publishes writers of all political persuasions, so long as they are critical of America's post-1965 immigration policies. Over a score of years, Plaintiff, through "VDARE.com" has overseen the publication of data, analysis, and editorial commentary from a wide variety of writers of various races, religions, nationalities and political affiliations.

12.     The Defendant New York Times Company, has, for over a hundred years, published a newspaper, *The New York Times.*

13.     Under Defendant, *The New York Times* has become what is widely regarded as the most prestigious and trusted newspaper in the United States.

14.     Under Defendant, *The New York Times* has committed itself to fairness and impartiality, for which admirable traits it has historically been known and which have contributed strongly to the prestige and trust with which *The New York Times* has been regarded.

15.     Indeed, the Defendant publishes a manual of both style and journalistic ethics known as The New York Times Manual on Style and Usage (hereafter, the "Manual").

16.     Upon information and belief, the Manual has set the Defendant's rules for *The New York Times* for more than a century.

17.     The Manual confirms and reaffirms Defendant's commitment to the fairness and impartiality which have earned *The New York Times* the trust and prestige of a large part of the American public.

18.     For example, as part of its commitment to fairness and impartiality, the Manual holds that:

> "The news report takes no sides and plays no favors in what it covers or what it omits...
> "The Times forgoes innuendo: An accusation that would not be acceptable in

made outright cannot be implied through sly juxtaposition, the equivalent of a coked eyebrow.

"Writers and editors should guard against word choices that undermine neutrality. If one politician is *firm* or *resolute,* an opponent should not be *rigid* or *dogmatic*." If one country in a conflict has a *leadership* while the other has a *regime*, impartiality suffers. Negative overtones, in coverage of a figure in the news, are easily detected and repaired...

"Divisive issues like religion, politics, abortion and race relations call for extra sensitivity to neutrality in language...

"Special care must be taken when partisan information comes from news sources who are identified incompletely or not at all. They should not be permitted the appearance or reality of hiding behind The Times when attacking others. See Anonymity.

"And when, despite all efforts, The Times slips from neutrality, it is prompt and thorough in rectifying errors or lapses of fairness..." (emphasis in the original)

Earlier versions of the Manual, such as the "Revised Edition" published in 1976

had held that:

"Fairness and impartiality... should be the hallmark of all news articles and news analyses that appear in the Times. *It is of paramount importance that people or organizations accused, criticized or otherwise cast in a bad light have an opportunity to speak in their own defense... Thus it is imperative that the reporter make every effort to reach the accused* … If it is not possible to do so, the article should say that the effort was made and explain why it did not succeed." (emphasis supplied)

The current edition of the Manual continues to abide by this rule, stating:

"[Editors'] notes acknowledge (and rectify, when possible) lapses of fairness, balance or perspective – faults more subtle or less concrete than factual errors, though as grave and sometimes graver. *Examples might include The Times failure to seek a comment from someone denounced or accused in its columns, or the omission of one party's argument in a controversy*, resulting from haste in fitting an article into too small a space..." (emphasis supplied)

19.     Another aspect of Defendant's longstanding commitment to fairness and impartiality has

been its attempt to avoid the use of anonymous sources wherever possible; indeed the Manual casts anonymity as "a last resort, for situations in which The Times could not otherwise publish information it considers newsworthy and reliable."

20.     The Manual holds that the best source for readers is one who can be identified by name, but also describes when anonymous sources can be used.

21.     The Manual holds that "If concealment proves necessary, writers should tell readers as much as possible – without violating the promise of confidentiality – to help them assess the source's credibility.  In particular, how does the source know the information? And does he or she have a stake in the issue?"

22.     Upon information and belief, this is because Defendant has historically expected it reporters and editors to, in effect, vouch for the sources' claims before publication of any news or news analysis.

23.     The Manual also holds that anonymous sources are not permitted to make derogatory statements about someone, stating "Anonymity should not be used as a cloak for personal attacks.  The vivid language of direct quotation confers an unfair advantage on an unnamed speaker, and turns of phrase are valueless to a reader who cannot assess the source."

24.     Another hallmark of Defendant's commitment to fairness and impartiality has been its well known and longstanding prohibition, in contrast to other newspapers, of any admixture of news, on the one hand, and opinion or editorializing, on the other.  In reference to a newspaper, the Manual specifically reserves "news" for "the factual reporting and analysis by the news staff," while "editorial" is reserved for "the opinion

sections and their staffs."

25.     Indeed, Defendant has rigidly committed itself to keeping news and opinion separate, so

much so that the separation was long known internally at *The New York Times* as the

"separation of church and state."

26.     In what is yet another attempt to induce the trust of readers, the Defendant has set a policy

of promptly correcting all factual errors called to its attention in a prominent space

specially reserved for such corrections in the paper:

> "Because its voice is loud and far-reaching, The Times recognizes an ethical
> responsibility to correct all its factual errors, large and small (even misspellings
> of names), promptly and in a prominent reserved space in the paper... Whether
> an error occurs in a print article, a digital graphic, a video, a tweet or a news
> alert, readers should expect us to correct it. There is no five-second rule. It does
> not matter if it was online for seconds or minutes or hours."

27.     Indeed, the Defendant publicly informs its readers and acknowledges its ethical obligation

to make prompt corrections by explicitly proclaiming the above policy.

28.     Upon information and belief, Defendant understands that its commitment to fairness and

impartiality, its commitment to reaching out to men or organizations which are being

criticized or otherwise cast in a bad light, its commitment to avoiding negative overtones

and guarding against word choices the undermine neutrality, its commitment to "the

separation of church and state," and its policy of making prompt and public corrections,

induce a sense of trust in readers and contribute to the prestige of *The New York Times*;

and in fact are designed, in part, to earn that trust and garner that prestige.

29.     Upon information and belief, Defendant is also committed to uninhibited, robust and

wide open debate on all topics, and proudly acknowledges that it was the beneficiary of

one of the landmark cases of modern First Amendment jurisprudence, to wit, *New York Times Co. v. Sullivan*, 376 US 254 (1964).

30.    Upon information and belief, Defendant also understands that the privilege and license of a free press are meant to serve the larger issue of free speech and free inquiry, as in the *New York Times Co. v. Sullivan* decision.

31.    Upon information and belief, Defendant understands that, ironically, speech can have a silencing effect that chills debate, especially where speech is used to enforce taboos or engage in *ad hominem* attacks by questioning the motives or character of people who pursue taboo subjects, or stray from perceived orthodoxy.

32.    Defendant understand that the subjects of race and racial differences are subject to some of the most heavily fraught taboos in contemporary American society.

33.    And Defendant has explicitly acknowledged such.  For example, on or about September 17, 2002, Defendant published an article entitled "In Nature vs. Nurture, a Voice for Nature" which stated in relevant part:

> "Who should define human nature? When the biologist Edward O. Wilson set out to do so in his 1975 book 'Sociobiology,' he was assailed by left-wing colleagues who portrayed his description of genetically shaped human behaviors as a threat to the political principles of equal rights and a just society. *"Since then, a storm has threatened anyone who prominently asserts that politically sensitive aspects of human nature might be molded by the genes. So biologists, despite their increasing knowledge from the decoding of the human genome and other advances, are still distinctly reluctant to challenge the notion that human behavior is largely shaped by environment and culture. The role of genes in shaping differences between individuals or sexes or races has become a matter of touchiness, even taboo.*
> *"A determined effort to break this silence and make it safer for biologists to discuss what they know about the genetics of human nature has now been begun by Dr. Steven Pinker, a psychologist of language at the Massachusetts Institute of Technology.*  (emphasis added)

34.     Indeed, with well known examples, encompassing everyone from (arguably) vulgar types,

such as former NBA Clippers owner Donald Sterling, to eminent and distinguished

gentlemen, such as Nobel Prize Winner James Watson,  Defendant is certainly aware of a

number of salient examples of how orthodoxy on racial views is enforced.  For example,

on January 11, 2019, Defendant had reported on renewed controversy surrounding Dr.

Watson's remarks on the link between I.Q. differences and race by stating:

> "Dr. Watson, one of the most influential scientists of the 20th century, had
> apologized after making similar comments to a British newspaper in 2007. At
> the time, he was forced to retire from his job as chancellor at Cold Spring
> Harbor on Long Island..."

Defendant's own summary of said January 11, 2019 news story, which was set

below the headline, stated: "In a recent documentary, the geneticist doubled down

on comments he made a decade ago, then apologized for, regarding race, genetics

and intelligence."  Indeed. Dr. Watson's forced recantation recalls nothing so

much as Gallileo's "Eppur si muove."  The all but naked coercion of Dr. Watson

was not lost on Defendant.

35.     Defendant is thus acutely aware of the silencing power of speech and the way in which

otherwise robust debate can be confined by *ad hominem* attacks on the character of those

who stray to the edge, or beyond the edge, of conventional debate.

36.     But consistent with its commitment to free speech, Defendant itself has in the past

bravely pushed the boundaries of the taboo on race differences.  For example:

a.      On or about July 20, 2001, Defendant published in *The New York Times* an article

entitled "Genome Mappers Navigate the Tricky Terrain of Race," which stated in

relevant part:

> "Scientists planning the next phase of the human genome project are being forced to confront a treacherous issue: the genetic differences between human races."

b.     On or about November 5, 2001, Defendant published in *The New York Times* an

article entitled "Study Finds Genetic Link Between Intelligence and Size of Some

Regions of the Brain" which stated in relevant part:

> "Lunging into the roiled waters of human intelligence and its heritability, brain scientists say they have found that the size of certain regions of the brain is under tight genetic control and that the larger these regions are the higher is intelligence."

c.     On or about July 30, 2002, Defendant published in *The New York Times* an article

entitled "Race Is Seen as Real Guide to Track Roots of Disease", which stated in

relevant part:

> "Challenging the widely held view that race is a 'biologically meaningless' concept, a leading population geneticist says that race is helpful for understanding ethnic differences in disease and response to drugs. The geneticist, Dr. Neil Risch of Stanford University, says that genetic differences have arisen among people living on different continents and that race, referring to geographically based ancestry, is a valid way of categorizing these differences."

d.     On or about Oct 8, 2002, Defendant published in *The New York Times* an article

entitled "A New Look at Old Data May Discredit a Theory on Race," which stated

in relevant part:

> "Two physical anthropologists have reanalyzed data gathered by

Franz Boas, a founder of American anthropology, and report that he erred in saying environment influenced human head shape. Boas's data, the two scientists say, show almost no such effect. The reanalysis bears on whether craniometrics, the measurement of skull shape, can validly identify ethnic origin…"

e.     On or about December 24, 2002, Defendant published in *The New York Times* an article entitled "The Palette of Humankind", which stated in relevant part:

"Humankind falls into five continental groups - broadly equivalent to the common conception of races - when a computer is asked to sort DNA data from people from around the world into clusters."

f.     On or about December 20, 2002, Defendant published in *The New York Times* an article entitled "Gene Study Identifies 5 Main Human Populations", which stated in relevant part:

"Scientists studying the DNA of 52 human groups from around the world have concluded that people belong to five principal groups corresponding to the major geographical regions of the world: Africa, Europe, Asia, Melanesia and the Americas. The study, based on scans of the whole human genome, is the most thorough to look for patterns corresponding to major geographical regions. These regions broadly correspond with popular notions of race, the researchers said in interviews."

g.     On or about March 20, 2003, Defendant published in *The New York Times* an article entitled "2 Scholarly Articles Diverge on Role of Race in Medicine, " which stated in relevant part:

"A view widespread among many social scientists, endorsed in official statements by the American Sociological Association and the American Anthropological Association, is that race is not a valid biological concept. But biologists, particularly the population geneticists who study genetic variation, have found that there is a

structure in the human population. The structure is a family tree showing separate branches for Africans, Caucasians (Europe, the Middle East and the Indian subcontinent), East Asians, Pacific Islanders and American Indians....Biologists, too, have often been reluctant to use the term 'race.' But this taboo was broken last year by Dr. Neil Risch, a leading population geneticist at Stanford University. Vexed by an editorial in The New England Journal that declared that race was 'biologically meaningless,' Dr. Risch argued in the electronic journal Genome Biology that self-identified race was useful in understanding ethnic differences in disease and in the response to drugs."

37.    In apparent opposition to the Defendant, and in stark contrast to Defendant's purported

commitment to

a.    fairness and impartiality,

b.    refraining from unfairly casting people in a bad light,

c.    avoiding negative overtones and maintaining neutrality,

d.    avoiding anonymous sources,

e.    "the separation of church and state;" and

f.    the policy of making corrections promptly, publicly and prominently,

is the Southern Poverty Law Center (the "SPLC"), which holds to none of the above

ideals.

38.    The SPLC is a dubious organization known by the Defendant to be highly questionable as

a source of information.

39.    The SPLC was exposed in the *Montgomery Advertiser*, decades ago in 1994, as a fund-

raising scam which deliberately falsifies and inflates the threat of subjectively defined

"hate" in order to bilk gullible donors and thereby bring in enough money to fund high

salaries for its executive officers.

40.  Upon information and belief, the Defendant took notice of the *Montgomery Advertiser* expose when published, and certainly no later than May 12, 1996 – well before January 15, 2019 when the first of the publications at issue herein was made.

41.  The SPLC is not committed to fairness and impartiality, but is openly partisan; and is known to be openly partisan by Defendant.

42.  More than that, the SPLC is – in opposition to uninhibited, robust, and wide open debate – committed to persecuting people for holding unorthodox opinions.

43.  Thus, in 2008, Mark Potok, an SPLC operative associated with a project that spies on men for holding unorthodox opinions, stated the following regarding the SPLC's work:

> "Our criteria for a hate group, first of all, have nothing to do with criminality, or violence, or any kind of guess we're making about 'this group could be dangerous.' It's strictly ideological."

> and

> "We see this political struggle, right? …I mean, we're not trying to change anybody's mind. We're trying to wreck the groups, and we are very clear in our head, this is[sic]… we are trying to destroy them. Not to send them to prison unfairly or not take their free speech rights away… but as a political matter, to destroy them."

44.  Upon information and belief, the Defendant took notice of the above statements by Potok no later than 2008, and certainly well before January 15, 2019 when the first of the publications at issue herein was made.

45.  Going well beyond mere anonymous sources (which practice the Defendant supposedly condemns – see Paragraphs 19–23 above), the SPLC makes broad use of a network or

unscrupulous characters who spy on fellow citizens, not, as Potok admitted above, for being dangerous or criminal, but merely for holding unorthodox opinions.

46.  Upon information and belief, the Defendant readily understands this, and has understood this well before January 15, 2019 when the first of the publications at issue herein was made.

47.  Regrettably, Defendant has conceived of a plan to target Plaintiff and intentionally defame him, in the process violating its long held standards of conduct, even as it leverages the prestige and trust gathered to it over many years to increase the sting of defamation against Plaintiff.


FIRST CAUSE OF ACTION

48.  Thus, on or about January 15, 2019, the Defendant New York Times Company did falsely and maliciously publish in *The New York Times*, online and in electronic format, an article entitled "A Timeline of Steve King's Racist Remarks and Divisive Actions" concerning the Plaintiff, hereafter "the Online Article."

49.  The very next day, the Defendant New York Times Company did falsely and maliciously publish in *The New York Times*, in print or paper format, the same or substantially same version of the Online Article, at Section A, Page 14 of the New York edition, but with a different headline, to wit "On the Record: Incendiary Remarks and Divisive Actions", hereafter, the "Print Article."

50.  By means of both the Online Article and the Print Article, the Defendant published false and defamatory matter which accused Plaintiff Brimelow of being an "open white

nationalist."

51.     By means of both the Online Article and the Print Article, the Defendant published false and defamatory matter which accused Plaintiff Brimelow of being a figure of division and racism.

52.     The aforesaid the Online Article and the Print Article contained false and defamatory matter wherein it stated, under a banner reading "A Timeline of Steve King's Racist Remarks and Divisive Actions":

    a.     2012. On a panel at the Conservative Political Action Conference with Peter Brimelow, an open white nationalist...

53.     The statements referenced in Paragraph 52 above were and are false and untrue.

54.     The statements referenced in Paragraph 52 above referred to the Plaintiff.

55.     The statements referenced in Paragraph 52 above were published by the Defendant and widely read and discussed by the public at large. Indeed, the statements referenced in Paragraph 52 above were circulated widely and quickly.

56.     For example, amongst other places, the smear about Plaintiff being "an open white nationalist" was carried into the Congressional Record by Representative Bobby Rush in the days after publication.

57.     The statements referenced in Paragraph 52 were published by the Defendant

    a.     without seeking corroboration from the most obvious source, *viz*. Plaintiff Brimelow, who did and does deny being a white nationalist, let alone an "open white nationalist."

    b.      without seeking corroboration from another obvious source, to wit, Plaintiff's

website, "VDARE.com" which explicitly claims and claimed prior to January 15, 2019, that neither it, nor Plaintiff, is "white nationalist."

c.     without linking to Plaintiff's website, "VDARE" or to any original writings by Plaintiff.

d.     in apparent reliance on a highly questionable source with a reputation for persistent inaccuracies, namely the SPLC, which source Defendant has known to be highly questionable well before publication on January 15, 2019.

e.     with preconceived hostility toward Plaintiff as an ideological opponent.

f.     in the face of repeated and persistent denials, as will be seen.

58.    Thus, the Online Article and the Print Article were published in egregious deviation from accepted newsgathering standards and in extreme departure from of Defendant's own commitment to fairness and impartiality, and specifically against its policy of affording one who was being attacked the opportunity to speak in his own defense.

59.    Plaintiff called Defendant's attention to the defamatory material in a letter from his attorney dated January 17, 2019, which was received by Defendant on January 17, 2019.

60.    In said January 17, 2019 letter, Plaintiff explained that:

> "Mr. Brimelow is not a 'white nationalist' and, specifically, does not refer to himself as such. To the contrary, he has repeatedly said that he is a 'civic nationalist.' For example, in a February 23, 2018 interview with Slate's Osita Nwanevu, Mr. Brimelow stated as follows: 'Personally, I would regard myself as a civic nationalist.'"

61.    In the same January 17, 2019 letter, Plaintiff explained, with unimpeachable logic, that:

"The fact that VDARE has published some critiques of America's immigration policies from those who aim to defend the interests of whites does not mean that Mr. Brimelow is an 'open white nationalist,' any more than the New York Times's decision to publish op-eds by avowed socialists makes it 'openly socialist.'"

Then, too, the letter made the point that:

"The website that Mr. Brimelow edits, VDARE.com, is a forum site that publishes writers of all political persuasions, so long as they are critical of America's post-1965 immigration policies. Over the course of nearly 20 years, VDARE has published data, analysis and editorial commentary from a wide variety of writers of every race, religion, nationality and political affiliation."

62. Defendant responded by continuing to breach their own ethics and standards in what became an increasingly clear pattern of malice – both "common law" malice and *New York Times v Sullivan*" malice.

63. Thus, in tacit acknowledgment of its error, Defendant partially corrected the Online Article by removing the adjective "open" from its description of Plaintiff.

64. However, as stated above, Defendant has a publicly avowed policy of making corrections promptly, explicitly and in a prominent reserved space, as per its stated policy.

65. But Defendant, because of its malice toward Plaintiff, refused to apply its own policy toward Plaintiff.

66. Instead, Defendant made an unacknowledged edit (or "stealth edit") in the Online Article and refused to make even this measly correction promptly, explicitly and in a prominent reserved space.

67. And Defendant continued to label Plaintiff a "white nationalist."

68. More than that, Defendant aggravated its original defamation and continued with its

pattern of ill will and malice toward Plaintiff by adding a hyperlink to the term "white nationalist" in its Online Article, which linked to a smear piece by the SPLC. That link can be found here:

htttps://www.splcenter.org/fighting-hate/extremist-files/individual/peter-brimelow

69. The link, found under the SPLC's "fighting-hate" and "extremist-files," accuses Plaintiff of hate and states, among other things, that Plaintiff is a "white nationalist" who allegedly "warns America of pollution by Catholics."

70. This is manifestly false and outrageous, given that Brimelow's first wife (who has passed on) was Catholic, as is his second wife; and several of his children were and are being raised Catholic, facts which could be easily discovered if Defendant cared to check with Plaintiff beforehand.

71. The link furthermore castigates Plaintiff for publishing articles on the science of racial differences in the words "VDARE.com posts... defenders of The Bell Curve — a highly controversial book arguing that whites are more intelligent than blacks — like Steve Sailer."

72. Furthermore, there is material on the SPLC website that makes clear that the SPLC categorizes Plaintiff under the "hate" category because of his publication of science dealing with racial differences, of which material the Defendant is aware.

73. Indeed, in a later article on November 18, 2019, Defendant would explicitly acknowledge that the SPLC categorizes both Brimelow and VDARE as sources of alleged "hate" for the publication of science dealing with racial differences.

74. Defendant was thus endorsing and vouching for the accuracy of the SPLC smear in a

news article.

75. Defendant was furthermore asserting as a fact that its readers could rely on the SPLC definition of "hate" as accurate, despite knowing that the SPLC is itself a partisan and unreliable source, which utilizes subjective definitions of "hate" with the aim of suppressing free speech and confining debate.

76. Furthermore, it was knowingly false – and grossly hypocritical – for the Defendant to join in the SPLC condemnation of Plaintiff as an alleged hate filled white nationalist based upon his publication of articles on the science of racial differences, when the Defendant both knew and knows full well that it had itself published numerous articles on the science of racial differences, as set forth at Paragraph 36 above.

77. Indeed, the author of most or all of the above articles at Paragraph 36 was well respected science author Nicholas Wade, who was an employee of Defendant for roughly thirty years.

78. But Mr. Wade, too, came in for condemnation by the SPLC for writing about the science of race differences.

79. The SPLC condemned Mr. Wade in an article published by the SPLC on May 28, 2014.

80. This is, of course, additional proof of the charge that the SPLC is an unreliable source, a money raising scam meant to bilk gullible people by exaggerating the threat of "hate."

81. Upon information and belief, Defendant was well aware of the SPLC's denunciation of Mr. Wade on May 28, 2014, well before Defendant agreed to begin endorsing the SPLC smears of Plaintiff on January 15, 2019.

82. Nevertheless, Defendant knows that it itself is not a purveyor of hate or white nationalism

because it has published articles on the science of racial differences.

83. Defendant therefore knew, in its "stealth edit" and hyperlink to the Online Article, that it was false to label Plaintiff a purveyor of hate or white nationalism because he had overseen the publication of articles on the science of racial differences, or to repeat and endorse the false claims of those who would so label Plaintiff.

84. Nevertheless, Defendant endorsed the smear of Plaintiff in its "stealth edit" and hyperlink to the Online Article in an act of bad faith and deliberate falsity.

85. Subsequent letters were sent by Plaintiff's attorney on February 15, 2019, September 27, 2019, and October 16, 2019, which all stressed that the Defendant's false and defamatory story had not been rectified by the "stealth edit" (and which "stealth edit" was itself another deviation from the Defendant's own standards) and had in some measure been aggravated by Defendant's endorsement of the SPLC's smear piece; and which requested that Defendant at least publish a "Letter to the Editor" in which Plaintiff defended himself.

86. These letters were received by Defendant on or about the above referenced dates by e-mail and, upon information and belief, seen and discussed internally by Defendant.

87. Meanwhile, even as the above letters were sent and discussed by Defendant, wherein Plaintiff increasingly protested his defamatory smear by Defendant's endorsement of the SPLC, it became increasingly clear throughout early 2019 that the SPLC was an even worse and disreputable organization than had been known.

88. One of the criticisms made clear by the *Montgomery Advertiser* in 1994 had been that the SPLC was too much the reflection – one might say the shadow – of one particularly

dubious man: Morris Dees.

89. Again, this fact was well known to Defendant, whose reporters have repeatedly covered the SPLC and checked many stories against the SPLC over the years.

90. On or about March 14, 2019, Morris Dees was suddenly fired from the SPLC under circumstances that suggest both sexual and racial improprieties on his part, which improprieties had consistently dogged Dees since even the *Montgomery Advertiser* articles decades ago.

91. Upon information and belief, such sexual and racial improprieties on the part of Morris Deed have been confirmed by the Defendant through its own contacts for many years.

92. In the days after March 14, 2019, many stories began to surface in the press about the hypocrisy and phoniness of the SPLC, including one in *The New Yorker* on March 21, 2019, by former SPLC employee Bob Moser.

93. In said article, Moser noted the SPLC's well documented practice of exaggerating hate and recalled "the hyperbolic fund-raising appeals, and the fact that, though the center claimed to be effective in fighting extremism, 'hate' always continued to be on the rise, more dangerous than ever, with each year's report on hate groups. 'The S.P.L.C.—making hate pay,' we'd say."

94. In said article, one particularly significant observation was that the SPLC's scam was an all but an open secret. As the New Yorker article recalled: "Walking to lunch past the center's Maya Lin–designed memorial to civil-rights martyrs, we'd cast a glance at the inscription from Martin Luther King, Jr., etched into the black marble—'Until justice rolls down like waters'—and intone, in our deepest voices, 'Until justice rolls down like

dollars.'"

95. Upon information and belief, Defendant not only read the *New Yorker* article by Bob Moser on March 21, 2019, but has, through its own reporters, long known of the truth of the allegations in Moser's article, and like facts about the SPLC.

96. Nevertheless, as the SPLC's troubles began to mount, with first Morris Dees being mysteriously fired, and then SPLC President Cohen suddenly and mysteriously resigning about a week later on March 23, 2019, the utter lack of credibility at the SPLC was apparent to all, even to its apparent ideological allies within Defendant.

97. But, due to a pre-conceived plan to defame Plaintiff, and animated by malice as aforesaid, Defendant resolutely refused to back down from its categorization of Plaintiff as a "white nationalist" on the word of the SPLC.

98. Similarly, in late 2019 Defendant continued, in what were additional unfair instances of malice and ill will directed against Plaintiff, to refuse to publish an expanded letter by Plaintiff defending himself against both the January 16-16, 2019 articles and further instances malice and ill will in August and September of 2019, directed against Plaintiff by Defendant in his role as Editor of VDARE.

99. Plaintiff, through his attorney, sent a proposed "Letter to the Editor" via certified mail and e-mail on September 27, 2019, which was received but never published by Defendant.

100. The above actions show that both the Online Article and the Print Article were published with "actual malice" under *New York Times v. Sullivan* and its progeny, in the sense of knowing falsehood or reckless disregard, and a deliberate attempt to purposefully avoid the truth. In the alternative, they were published in a grossly irresponsible manner

without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties; in further alternative, they were published with a lack of ordinary care and a failure to use that degree of care that a reasonable and prudent man would have used under the same circumstances.

101. In the statements referenced in Paragraph 52 above, the Defendant imputed to Plaintiff race hatred and traits inconsistent with his profession.

102. The statements referenced in Paragraph 52 above exposed the Plaintiff to public hatred, contempt, ridicule, and disgrace, lowered his reputation, and deterred decent people from associating or dealing with him.

103. The Defendant, by the publication of the statements referenced in Paragraph 52 above, meant and intended to expose the Plaintiff to public hatred, contempt, ridicule, and disgrace, to lower his reputation, and to deter decent people from associating or dealing with him.

104. By reason of the publication of the statements in Paragraph 52 above, Plaintiff has been injured in his good name, fame, credit, profession, and reputation as a man, and in his various public and private positions, callings, and lines of endeavor, and has been held up to public ridicule before his acquaintances and the public, and to suffer the loss of prestige and standing in his community and elsewhere.

105. By reason of the publication of the statements in Paragraph 52 above, Plaintiff has suffered special damages in the form of injury and loss of pecuniary opportunities in an amount of approximately $700,000.

106. The Defendant was actuated by ill will, malice, conscious disregard of the rights of

others, and was willful and wanton in its publication of the statements referenced in

Paragraph 52 above, thereby entitling Plaintiff to punitive damages.


SECOND CAUSE OF ACTION

107.    Plaintiff repeats the above allegations.

108.    On or about August 23, 2019  the Defendant New York Times Company did falsely and

maliciously publish in *The New York Times*, online and in electronic format, an article

entitled "Justice Department Newsletter Included Extremist Blog Post."

109.    A print version of the very same article was printed the following day.

110.    The aforesaid the article contained false and defamatory matter wherein it stated:

a.      A national union for the judges said the blog post "directly attacks sitting

immigration judges with racial [sic] and ethnically tinged slurs."

b.      That term [viz. "kritarch"] has historically been used in a non-pejorative way to

describe "rule by judges," but more recently it has been co-opted by white

nationalists and anti-Semitic extremists, according to the Anti-Defamation

League.

c.      The Southern Poverty Law Center classifies VDARE as an anti-immigration hate

website.

d.      On Thursday, Judge A. Ashley Tabaddor, the union's president and the judge of

Iranian descent who was pictured in the VDare post, wrote to James McHenry, the

director of the immigration review office, to protest the newsletter's inclusion of

the post, saying it "directly attacks sitting immigration judges with racial and

ethnically tinged slurs."

e.      "VDare's use of the term in a pejorative manner casts Jewish history in a negative

light as an anti-Semitic trope of Jews seeking power and control," Judge Tabaddor

wrote in the letter, referring to "kritarch."

f.      On Friday, Judge Tabbador said she learned about the newsletter from colleagues

who were outraged about the link to the white nationalist website.  "If I had sent

this, I would be facing serious disciplinary action," she said. "We get trained

about zero tolerance of discriminatory and racist actions."

g.      "It is shocking and outrageous that a vile, racist attack against distinguished jurists

was linked and distributed from an official U.S. government publication," the

union's president, Paul Shearon, said in a statement. "The Department of Justice

is supposed to enforce our nation's laws against ethnic, racial and religious

discrimination, not fan the flames of such hatred."

h.       Aryeh Tuchman, associate director of the Anti-Defamation League's Center on

Extremism, said that "kritarchy" had long been used to describe "rule by

judges."... But he added that it appeared that extremists, "mainly confined to the

racist, anti-immigrant site VDare, have co-opted the term to refer to liberal

American judges as 'kritarchs'."... "Many of the extremists on VDare who use

this term are in fact anti-Semites, and they may intentionally be using 'kritarch' as

a way to express their anti-Semitism, but on its own, the term is not self-evidently

anti-Semitic," he said.

111.    The statements referenced in Paragraph 110 above were and are false and untrue, and

imply false assertions of fact. Indeed, the statements were absurd in that they implied that the term "kritarchy" – a perfectly normal political science term which means "rule by judges" – had suddenly been transformed into an anti-Semitic code word.

112. Plaintiff is widely known in his capacity as both the creator and editor of VDARE.

113. Plaintiff had come to be known synonymously with VDARE to the public at large, and certainly with Defendant.

114. Plaintiff is one of a small group of people who run the day to day operations of VDARE.

115. Plaintiff is the editor of VDARE and is identified as such on the website.

116. Furthermore, a close association between Plaintiff and VDARE is evidenced by the SPLC's website, which was referenced by Defendant in the very article in question. For example, the SPLC's webpage devoted to VDARE prominently features two photographs of Plaintiff, who is identified as an "associated extremist" by such SPLC website.

117. Plaintiff is prominently featured on VDARE's "Our Story" webpage, which informs readers that "It all started with a bold idea: in the face of unwavering hostility from the Main Stream Media, our editor, Peter Brimelow, launched VDARE.com on Christmas Eve of 1999 as an extension of his national bestselling book, Alien Nation: Common Sense About America's Immigration Disaster. After all, the issues of unrestricted mass immigration, both legal and illegal, weren't going away. They were getting bigger."

118. Plaintiff's picture is displayed as the first of the small group of four people comprising "the VDARE People" on VDARE's "Our Story" webpage. A link to VDARE's "Our Story" webpage can be found here: https://vdare.com/about

119.  For all practical purposes, Plaintiff is the face of VDARE, and is known as such by both

friends and enemies of the VDARE site; and is easily discovered as such by following the SPLC attributions promoted and referenced by Defendant.

120. Indeed, numerous individuals have noted that the August 23, 2019 attack, like the later attacks of September 13, 2019 and May 5, 2020 below, were an attack on Plaintiff.

121. The statements referenced in Paragraph 110 identifies Plaintiff in such a way as to lead those who know him to understand that he was the person referred to.

122.  Thus, the statements referenced in Paragraph 110 above referred to the Plaintiff.

123. The statements referenced in Paragraph 110 above were published by the Defendant and widely read and discussed by the public at large.  Indeed, the statements referenced in Paragraph 110 above were circulated widely and quickly.

124. The statements referenced in Paragraph 110 above were published by the Defendant

   a.  without seeking corroboration from the most obvious source, *viz.* Plaintiff Brimelow.

   b.  without seeking corroboration from another obvious source, to wit, Plaintiff's website, "VDARE.com."

   c.  without linking to Plaintiff's website, "VDARE.com" or to the allegedly offensive post; or to any original writings by Plaintiff.

   d.  in apparent reliance on a highly questionable source with a reputation for persistent inaccuracies, namely the SPLC, which source Defendant has known to be highly questionable well before publication.

   e.  in apparent reliance on the bizarre reasoning provided by the ADL and Aryeh Tuchman.

f.     suggesting undisclosed facts, known to Defendant or to those whom they were quoting, but unknown to the readers, which justified the charge of alleged "anti-Semitism."

g.     with preconceived hostility toward Plaintiff as an ideological opponent.

h.     in the face of repeated and persistent denials demonstrated above.

125.   Thus, the above article was published in egregious deviation from accepted newsgathering standards and in extreme departure from of Defendant's own commitment to fairness and impartiality, and specifically against its policy of affording one who was being attacked the opportunity to speak in his own defense to avoid anonymous sources.

126.   The above actions show that the publication was made with "actual malice" under the standard of "New York Times v. Sullivan" and it progeny, in the sense of knowing falsehood or reckless disregard, and a deliberate attempt to purposefully avoid the truth. In the alternative, the publication was made in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties; in further alternative, it was published with a lack of ordinary care and a failure to use that degree of care that a reasonable and prudent man would have used under the same circumstances.

127.   The statements referenced in Paragraph 110  above exposed the Plaintiff to public hatred, contempt, ridicule, and disgrace, lowered his reputation, and deterred decent people from associating or dealing with him.

128.   The Defendant, by the publication of the statements referenced in Paragraph 110 above, meant and intended to expose the Plaintiff to public hatred, contempt, ridicule, and

disgrace, to lower his reputation, and to deter decent people from associating or dealing with him.

129. By reason of the publication of the statements in Paragraph 110 above, Plaintiff has been injured in his good name, fame, credit, profession, and reputation as a man, and in his various public and private positions, callings, and lines of endeavor, and has been held up to public ridicule before his acquaintances and the public, and to suffer the loss of prestige and standing in his community and elsewhere.

130. By reason of the publication of the statements in Paragraph 110 above, Plaintiff has suffered special damages in the form of injury and loss of pecuniary opportunities in an amount of approximately $700,000.

131. The Defendant was actuated by ill will, malice, conscious disregard of the rights of others, and were willful and wanton in their publication of the statements referenced in Paragraph 110  above, thereby entitling Plaintiff to punitive damages.


THIRD CAUSE OF ACTION

132. Plaintiff repeats the above allegations.

133. On or about September 13, 2019, the Defendant New York Times Company did falsely and maliciously publish in *The New York Times*, online and in electronic format, an article entitled "Top Immigration Judge Departs Amid Broader Discontent Over Trump Policies."

134. On or about September 14, 2019, the Defendant New York Times Company did falsely and maliciously publish in *The New York Times,* in print or paper format, the same or

substantially same version of the above article, at Section A, Page 17 of the New York edition, but with a different headline, to wit "Top Immigration Judge Departs After Shake-Up at Agency."

135. The aforesaid the articles contained false and defamatory matter wherein it stated:

    a.     Last month, tensions increased when a daily briefing that is distributed to federal immigration judges contained a link to a blog post that included an anti-Semitic reference and came from a website that regularly publishes white nationalists.

136. The blog post referenced above was a blog posted by VDARE.com.

137. Indeed, the above quoted words contained a hyperlink link to Defendant's prior August 23, 2019 article, referenced above.

138. The alleged "anti-Semitic reference" was the use of the word "kritarchy" – which is false and absurd.

139. The statements referenced in Paragraph 135 identifies Plaintiff in such a way as to lead those who know him to understand that he was the person referred to.

140. Thus, the statements referenced in Paragraph 135 above referred to the Plaintiff.

141. The statements referenced in Paragraph 135 above were published by the Defendant and widely read and discussed by the public at large. Indeed, the statements referenced in Paragraph 135 above were circulated widely and quickly.

142. The statements referenced in Paragraph 135 above were published by the Defendant

    a.     without seeking corroboration from the most obvious source, viz. Plaintiff Brimelow.

    b.     without seeking corroboration from another obvious source, to wit, Plaintiff's

website, "VDARE.com."

c.   without linking to Plaintiff's website, "VDARE.com" or to the allegedly offensive post; or to any original writings by Plaintiff.

d.   in apparent reliance on a highly questionable source with a reputation for persistent inaccuracies, namely the SPLC, which source Defendant has known to be highly questionable well before publication.

e.   confirming that Defendant had indeed endorsed as true – in a news article – the bizarre reasoning provided by the ADL and Aryeh Tuchman in the prior article on August 23, 2019.

f.   suggesting undisclosed facts, known to Defendant or to those whom they were quoting, but unknown to the readers, which justified the charge of alleged "anti-Semitism."

f.   with preconceived hostility toward Plaintiff as an ideological opponent.

g.   in the face of repeated and persistent denials demonstrated above.


143.  Thus, the above article was published in egregious deviation from accepted newsgathering standards and in extreme departure from of Defendant's own commitment to fairness and impartiality and specifically against its policy of affording one who was being attacked the opportunity to speak in his own defense.

144.  The above actions show that the publication was made with "actual malice" under the standard of "New York Times v. Sullivan" and it progeny, in the sense of knowing falsehood or reckless disregard, and a deliberate attempt to purposefully avoid the truth.

In the alternative, the publication was made in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties; in further alternative, it was published with a lack of ordinary care and a failure to use that degree of care that a reasonable and prudent man would have used under the same circumstances.

145. The statements referenced in Paragraph 135 above exposed the Plaintiff to public hatred, contempt, ridicule, and disgrace, lowered his reputation, and deterred decent people from associating or dealing with him.

146. The Defendant, by the publication of the statements referenced in Paragraph 135 above, meant and intended to expose the Plaintiff to public hatred, contempt, ridicule, and disgrace, to lower his reputation, and to deter decent people from associating or dealing with him.

147. By reason of the publication of the statements in Paragraph 135 above, Plaintiff has been injured in his good name, fame, credit, profession, and reputation as a man, and in his various public and private positions, callings, and lines of endeavor, and has been held up to public ridicule before his acquaintances and the public, and to suffer the loss of prestige and standing in his community and elsewhere.

148. By reason of the publication of the statements in Paragraph 135 above, Plaintiff has suffered special damages in the form of injury and loss of pecuniary opportunities in an amount of approximately $700,000.

149. The Defendant was actuated by ill will, malice, conscious disregard of the rights of others, and were willful and wanton in their publication of the statements referenced in

Paragraph 135 above, thereby entitling Plaintiff to punitive damages.


## FOURTH CAUSE OF ACTION

150.   Plaintiff repeats the above allegations.

151.   On or about November 18, 2019, the Defendant New York Times Company did falsely
and maliciously publish in *The New York Times*, online and in electronic format, an
article entitled "The White Nationalist Websites Cited by Stephen Miller."

152.   The aforesaid article was critical of Stephen Miller merely for the ideas he was allegedly
reading, evincing a strain of totalitarianism that has apparently infected Defendant.

153.   The aforesaid the article contained false and defamatory matter, including outright
misquotations, wherein it stated:

a.     Peter Brimelow, the founder of the anti-immigration website VDARE, believes
that... the increase in Spanish speakers is a "ferocious attack on the living
standards of the American working class."

b.     As a young Senate aide, Stephen Miller, President Trump's chief immigration
adviser, referred to the two sources while promoting his anti-immigration views,
suggesting deeper intellectual ties to the world of white nationalism than
previously known.

c.     "The heart of where these guys differ from neoconservatives and Republican
orthodoxy is basically: 'What is the American nation and what is the nature of
American nationhood?'" Lawrence Rosenthal, the chair and lead researcher at the
Berkeley Center for Right-Wing Studies at the University of California, said in an

interview. "It's not based on 'We hold these truths to be self evident.' It's based on 'What were the color of the people who wrote those words?'"

d.      The law center [i.e. the SPLC] has labeled VDARE a "hate website" for its ties to white nationalists and publication of race-based science...

e.      ..."it's easy to draw a clear line from the white supremacist websites where he is getting his ideas to current immigration policy."

f.      ..."both VDARE and American Renaissance are white nationalist organizations, who provide a pseudointellectual veneer to classic racism."

154.      The statements referenced in Paragraph 153 above referred to the Plaintiff.

155.      The statements referenced in Paragraph 153 above were published by the Defendant and widely read and discussed by the public at large. Indeed, the statements referenced in Paragraph 153 above were circulated widely and quickly.

156.      The statements referenced in Paragraph 153 above were published by the Defendant

a.      without seeking corroboration from the most obvious source, *viz*. Plaintiff Brimelow.

b.      without seeking corroboration from another obvious source, to wit, Plaintiff's website, "VDARE.com."

c.      without linking to Plaintiff's website, "VDARE.com" or to any original writings by Plaintiff.

d.      in apparent reliance on a highly questionable source with a reputation for persistent inaccuracies, namely the SPLC, which source Defendant has known to be highly questionable well before publication.

e.    against its policy of affording one being attacked the opportunity to speak in his own defense.

f.    with preconceived hostility toward Plaintiff as an ideological opponent.

g.    in the face of repeated and persistent denials, especially in the letters dated February 15, 2019,  September 27, 2019, and October 16, 2019, referenced above.

h.    with a steadfast refusal to publish any of Plaintiff's "Letters to the Editor" in which he defended himself.

157.    Thus, the above article was published in egregious deviation from accepted newsgathering standards and in extreme departure from of Defendant's own commitment to fairness and impartiality and against its policy of affording one being attacked the opportunity to speak in his own defense and to avoid anonymous sources.

158.    The above actions show that the publication was made with "actual malice" under the standard of "New York Times v. Sullivan" and its progeny, in the sense of knowing falsehood or reckless disregard, and a deliberate attempt to purposefully avoid the truth. In the alternative, the publication was made in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties; in further alternative, it was published with a lack of ordinary care and a failure to use that degree of care that a reasonable and prudent man would have used under the same circumstances.

159.    The statements referenced in Paragraph 153 above exposed the Plaintiff to public hatred, contempt, ridicule, and disgrace, lowered his reputation, and deterred decent people from associating or dealing with him.

160. The Defendant, by the publication of the statements referenced in Paragraph 153 above, meant and intended to expose the Plaintiff to public hatred, contempt, ridicule, and disgrace, to lower his reputation, and to deter decent people from associating or dealing with him.

161. By reason of the publication of the statements in Paragraph 153 above, Plaintiff has been injured in his good name, fame, credit, profession, and reputation as a man, and in his various public and private positions, callings, and lines of endeavor, and has been held up to public ridicule before his acquaintances and the public, and to suffer the loss of prestige and standing in his community and elsewhere.

162. By reason of the publication of the statements in Paragraph 153 above, Plaintiff has suffered special damages in the form of injury and loss of pecuniary opportunities in an amount of approximately $700,000.

163. The Defendant was actuated by ill will, malice, conscious disregard of the rights of others, and were willful and wanton in their publication of the statements referenced in Paragraph 153 above, thereby entitling Plaintiff to punitive damages.


FIFTH CAUSE OF ACTION

164. Plaintiff repeats the above allegations.

165. This action was first instituted on January 9, 2020 and Defendant was aware of it from at least February 3, 2020, when its attorneys first made their appearances in this case.

166. Defendant has thus know, since at least February 3, 2020, that Plaintiff has strenuously objected to the allegation that he is "racist" or "white supremacist" or otherwise animated

by race hatred, even to the point of litigating.

167. Furthermore, on May, 2, 2020, Plaintiff had transmitted a letter to Defendant (*via* its attorney) that reminded Defendant that it had published highly complimentary reviews of Plaintiff's work, particularly Richard Bernstein, *The Immigration Wave: A Plea to Hold Back*, NEW YORK TIMES, April 19, 1995, at 17, section C, wherein Defendant had published the words "The strong racial element in current immigration has made it more than ever before a delicate subject. It is to Mr. Brimelow's credit that he attacks it head on, unapologetically."

168. Said Letter of May 2, 2020 had also stressed Defendant's failure to abide by its own ethical rules in its continuing attacks on Plaintiff, as related at Paragraphs 14-28 above.

169. Nevertheless, on May 5, 2020, just days after receiving Plaintiff's fresh complaints in the course of this very lawsuit, Defendant continued to defame Plaintiff.

170. On or about May 5, 2020, the Defendant New York Times Company did falsely and maliciously publish in *The New York Times*, online and in electronic format, an article entitled "Facebook Says It Dismantles Disinformation Network Tied to Iran's State Media."

171. The aforesaid the articles contained false and defamatory matter wherein it stated:

a. In a monthly report of accounts suspended for so-called "coordinated inauthentic behaviour", Facebook said it had removed eight networks in recent weeks, including one with links to the Islamic Republic of Iran Broadcasting Corporation (IRIB).

b. The company also removed a U.S. network of fake accounts linked to QAnon, a

fringe group that claims Democrats are behind international crime rings, and a separate U.S.-based campaign with ties to white supremacist websites VDARE and the Unz Review.

c.     Nathaniel Gleicher, Facebook's head of cybersecurity policy, said both U.S. networks recently began pushing coronavirus-related disinformation, taking advantage of a surge in online interest in the pandemic to promote anti-Semitic and anti-Asian hate speech tied to it. "We've seen people behind these campaigns opportunistically leverage coronavirus-related topics to build an audience and drive people to their pages or off-platform sites," he said.

d.     The networks also pushed content focused on the upcoming U.S. presidential election, the report said

172.   The statements referenced in Paragraph 171 identifies Plaintiff in such a way as to lead those who know him to understand that he was the person referred to.

173.   Thus, the statements referenced in Paragraph 171 above referred to the Plaintiff.

174.   The statements referenced in Paragraph 171 above were published by the Defendant and widely read and discussed by the public at large. Indeed, the statements referenced in Paragraph 171 above were circulated widely and quickly.

175.   The statements are false and again accuse Plaintiff of race hatred and traits inconsistent with his profession as a journalist.

176.   The statements are false and accuse Plaintiff of manipulating on-line readers by utilizing a "bot-farm" of fake accounts.

177. The statements are false and also accuse Plaintiff of violating VDARE's 501(c)(3) status.

178. The statements referenced in Paragraph 171 above were published by the Defendant

    a.    without seeking corroboration from the most obvious source, viz. Plaintiff Brimelow.

    b.    without seeking corroboration from another obvious source, to wit, Plaintiff's website, "VDARE.com."

    c.    without linking to Plaintiff's website, "VDARE.com" or to the allegedly offensive post; or to any original writings by Plaintiff.

    d.    suggesting undisclosed facts, known to Defendant or to those whom they were quoting, but unknown to the readers, which justified the charges of alleged "anti-Semitism," "race hatred," promoting fake and dubious science, and manipulating on-line readers by utilizing a "bot-farm" of fake accounts.

    f.    with preconceived hostility toward Plaintiff as an ideological opponent.

    g.    in the face of repeated and persistent denials demonstrated above.


179. Thus, the above article was published in egregious deviation from accepted newsgathering standards and in extreme departure from of Defendant's own commitment to fairness and impartiality and specifically against its policy of affording one who was being attacked the opportunity to speak in his own defense.

180. The above actions show that the publication was made with "actual malice" under the standard of "New York Times v. Sullivan" and it progeny, in the sense of knowing falsehood or reckless disregard, and a deliberate attempt to purposefully avoid the truth.

In the alternative, the publication was made in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties; in further alternative, it was published with a lack of ordinary care and a failure to use that degree of care that a reasonable and prudent man would have used under the same circumstances.

181.  The statements referenced in Paragraph 171 above exposed the Plaintiff to public hatred, contempt, ridicule, and disgrace, lowered his reputation, and deterred decent people from associating or dealing with him.

182.  The Defendant, by the publication of the statements referenced in Paragraph 171 above, meant and intended to expose the Plaintiff to public hatred, contempt, ridicule, and disgrace, to lower his reputation, and to deter decent people from associating or dealing with him.

183.  By reason of the publication of the statements in Paragraph 171 above, Plaintiff has been injured in his good name, fame, credit, profession, and reputation as a man, and in his various public and private positions, callings, and lines of endeavor, and has been held up to public ridicule before his acquaintances and the public, and to suffer the loss of prestige and standing in his community and elsewhere.

184.  By reason of the publication of the statements in Paragraph 171 above, Plaintiff has suffered special damages in the form of injury and loss of pecuniary opportunities in an amount of approximately $700,000.

185.  The Defendant was actuated by ill will, malice, conscious disregard of the rights of others, and were willful and wanton in their publication of the statements referenced in

Paragraph 171 above, thereby entitling Plaintiff to punitive damages.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount no less than Five

Million Dollars, together with punitive damages, and the costs and disbursements of this action.

Dated: Goshen, New York      Yours, etc.
      May 26, 2020

              /s/ Frederick C. Kelly
              Frederick C. Kelly, Esq. (FK1986)
              *Attorney for Plaintiff*
              One Harriman Square
              Goshen, NY 10924
              Phone No.: (845) 294-7945
              Fax: (845) 294-7889
              fckelylaw@gmail.com