**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X

PETER BRIMELOW,

                                       Case 7:20-cv-00222

                Plaintiff,

                                       ORAL ARGUMENT
                                       REQUESTED

        -against-

NEW YORK TIMES COMPANY,

                Defendant.

-------------------------------------------------------------------X

 

PLAINTIFF PETER BRIMELOW'S OPPOSITION TO DISMISSAL UNDER RULE 12(b)

Dated: Goshen, New York
      July 28, 2020

                            Yours, etc.

                            /s/ Frederick C. Kelly
                            Frederick C. Kelly, Esq. (FK1986)
                            *Attorney for Plaintiff*
                            One Harriman Square
                            Goshen, NY 10924
                            Phone No.: (845) 294-7945
                            Fax: (845) 294-7889
                            fckelylaw@gmail.com

## **Table of Contents**

TABLE OF AUTHORITIES.......................................................................   iii

ARGUMENT......................................................................................   1

POINT I: DEFENDANT CONCEDES THAT
ITS ATTACKS AGAINST BRIMELOW HAVE
THE EFFECT OF STIFLING ROBUST DEBATE
AND ENFORCING TABOOS. ....................................................   6

POINT II: STATEMENTS APPEARING IN A NEWS SECTION
OF WHAT IS ARGUABLY THE MOST PRESTIGIOUS PAPER
IN AMERICA ARE TO BE CONSTRUED AS FACT,
ESPECIALLY WHERE THAT PAPER HAS A KNOWN PRACTICE
OF FORBIDDING THE TAINT OF OPINION
IN ITS NEWS SECTION.............. ...................................................   8

POINT III: THERE IS NOTHING REMOTELY ANTI-SEMITIC
ABOUT THE USE OF THE WORD "KRITARCHY."
FURTHERMORE, THE NEWS ARTICLES CHARGING
ANTI-SEMITISM HINTED AT UNDISCLOSED FACTS..........................   10

POINT IV: ACCORDING BRIMELOW ALL
REASONABLE INFERENCES, STATEMENTS
ABOUT VDARE IN THE SECOND, THIRD AND FIFTH
CAUSES OF ACTION ARE "OF AND CONCERNING"
BRIMELOW BECAUSE THE
EXTRINSIC FACTS ARE PLAUSIBLE..........................................................   12

POINT V: HYPERLINKING TO A WEBSITE
AND RESTATING THE DEFAMATORY MATERIAL
THEREIN IS ACTIONABLE............................................................................  14


POINT VI: THE CUMULATIVE ALLEGATIONS OF
ACTUAL MALICE ARE NOT ONLY PLAUSIBLE,
THEY ARE OVERWHELMING........................................................................ 16


POINT: VII: THE ACTUAL MALICE STANDARD ACTUALLY
UNDERMINES FIRST AMENDMENT PRINCIPLES
AND SHOULD BE RETIRED............................................................................ 22

## **Table of Authorities**

CASES:

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009).................................................................................. 5

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).................................................. 5

*Biro v Conde Nast*, 963 F.Supp.2d 255 (SDNY, 2013)................................................ 16

*Brady v Ottaway Newspapers*, 84 AD2d 226 (2nd Dept, 1981)................................... 12

*Borzellieri v. Daily News, LP*, 39 Misc3d 1215(A)..................................................... 9

*Brian v Richardson*, 87 NY2d 46 (1995).............................................................. 3, 9, 11

*Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163 (2nd Cir., 2000)...................... 18

*Chambers v Time Warner, Inc.*, 282 F.3d 147 (2nd Cir, 2002)................................... 5

*Chicherchia v Cleary*, 207 AD2d 855 (2nd Dept 1994)......................................... 12, 14

*Church of Scientology In't v. Behar*, 238 F.3d 168 (2nd Cir, 2001)........................... 16

*Curran v. Phila Newspapoers, Inc.*, 376 Pa Super 508 (Superior Ct PA, 1988)......... 16

*Davis v Boeheim,* 24 NY3d 262 (2014)............................................................... 2, 8

*Enigma Software Group USA v. Bleeping Computer LLC*,
194 F.Supp.3d 263 (SDNY 2016)...................................................................... 15, 16

*Fetler v Houghton Mifflin Co.*, 364 F2d 650 (2nd Cir., 1966)................................. 12

*Geisler v Petrocelli*, 616 F2d 636 (2nd Cir., 1980)................................................ 12

*Gertz v Robert Welch, Inc.*, 680 F2d 527 (7th Cir, 1982)........................................ 16

*Goldwater v Ginzburg*, 414 F2d 324 (2nd Cir, 1969)............................................ 16

*Gross v New York Times Co.*, 82 NY2d 146 (1993)......................................... 2, 3, 8, 9, 11

*Guccione v. Hustler Magazine, Inc.*, 800 F2d 298 (2nd Cir, 1986)................................................ 21

*Harwood Pharmacal Co. v National Broadcasting Co.*, 9 NY2d 460 (1961)............................... 12

*Harte–Hanks Communication v Connaughton,* 491 US 657 (1989)............................................ 16

*Herlihy v. Metropolitan Museum of Art*, 214 AD2d 250(1st Dept, 1995)............................... 3,  11

*Immuno AG v Moor-Jankowski*, 77 NY2d 235 (1991).........................................................3-4, 7, 9

*In re Phila Newspapers, LLC*, 690 F.3d 161 (3rd Cir, 2012)................................................... 14-15

*Kerik v. Tacopina*, 64 F.Supp.3d 542 (SDNY, 2014)................................................................... 16

*Lynch v. City of New York*, 952 F.3d 67 (2nd Cir. 2020)............................................................. 12

*Mann v Abel*, 10 NY3d 271 (2008)..................................................................................... 2, 4, 8

*McKee v Cosby*, 139 S.Ct. 675 (2019)....................................................................................... 22

*Michel v. NYP Holdings, Inc*, 816 F.3d 686 (11th Cir 2016)......................................................... 4

*Milkovich v. Lorain Journal Co*, 497 US 1 (1990)...................................................................... 12

*Mirage Entertainment, Inc v. FEG Entretenimientos, SA,*
326 F.Supp.3d 26 (SDNY, 2018)........................................................................................  14, 15

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)......................................................... 22, 24

*Nicosia v. Amazon.com, Inc.*, 834 F3d 220 (2nd Cir. 2016).......................................................... 12

*People v. Marino*, 35 AD3d 292 (1st Dept, 2006)......................................................................... 3

*People v. Sprately*, 152 AD3d 195 (3rd Dept, 2017)..................................................................... 3

*Republic of Colombia v. Diageo North America Inc.*, 531 F.Supp.2d 365 (EDNY, 2007)............ 5

*Rosenblatt v. Baer*, 383 U.S. 75 (1966)....................................................................................... 8

*Roth v United States*, 354 U.S. 476 (1957).................................................................................. 6

*Schermerhorn v. Rosenberg*, 73 AD2d 276 (2nd Dept, 1980)......................................................... 3

*Scott v. Cooper*, 226 AD2d 360 (2nd Dept, 1996)...........................................................3

*Sheridan v. Carter*, 48 AD3d 444 (2nd Dept, 2008)........................................................3

*Silverman v. Daily News, LP*, 129 AD3d 1054 (2nd Dept, 2015)....................................9

*Smith v. California*, 361 U.S. 147 (1959)......................................................................22

*St. Amant v. Thompson*, 390 U.S.727 (1968).................................................................18

*Taylor v. Carmouche*, 214 F.3d 788 (7th Cir. 2000).......................................................3

*Three Amigos SJL Rest., Inc. v CBS News Inc.*, 132 AD3d 82 (1st Dept 2015)............... 12-13, 14

*Wieman v. Updegraff,* 344 U.S. 183 (1952)....................................................................7

*United States v. Associated Presses*, 52 F.Supp 362 (SDNY 1943)................................6

RULES:

FRCP 12...................................................................................... 7, 12, 19, 20, 21

OTHER:

Anthony Lewis, Make No Law: The Sullivan Case and the First Amendment.......................... 24

Alexander Meiklejohn, *The First Amendment is an Absolute,*
SUPREME COURT REVIEW (1961)............................................................................. 8, 9

Merriam-Webster Dictionary (online) ...........................................................................2

John Stuart Mill, Autobiography................................................................................ 24

John Stuart Mill, On Liberty.................................................................................. 24, 25

New York PJI 3:25................................................................................................ 12

Restatement, Second, Torts § 564............................................................................ 12

Frederick F. Schauer,
*Language, Truth, and the First Amendment: An Essay in Memory of Harry Canter*,
64 VIRGINIA LAW REVIEW 263 ............................................................................................ 9

Alexis de Tocqueville, Democracy in America ................................................................. 23-24

ARGUMENT

From January 15, 2019 through May 5, 2020, Defendant New York Times Company[1] carried on a remarkable campaign of vilification against Plaintiff Peter Brimelow.  *DKT. 22, ¶¶48–170*.  From the first date to the last, Defendant launched a series of attacks aimed at him, all carried in the news section of Defendant's paper, *The New York Times*.  Defendant, which had formerly celebrated Brimelow, now charged him with being "an open white nationalist," with "attack[ing] sitting immigration judges with racial and ethnically tinged slurs," with running a "hate website," with "us[ing]... [the word kritarchy] in a pejorative manner [to cast] Jewish history in a negative light as an anti-Semitic trope of Jews seeking power and control," with posting "an anti-Semitic reference" on a blog, with running a "white supremacist website," and with running a "network of fake accounts," among other things. *Id.*

Defendant kept up the attacks in the face of repeated written protests by Brimelow. Defendant refused to permit Brimelow to publish a letter to the editor defending himself, brushing off several requests.  *DKT. 22, ¶85.*  Perhaps most incredibly, Defendant continued the campaign even after this action alleging libel was instituted, and even after Brimelow had reminded Defendant, in submissions before the Court, that Defendant itself was "guilty" of the same kind of deviations from orthodoxy on the science of racial differences, for which it was lately condemning him. *DKT. 22, ¶18.*  Brimelow had also stressed, again in submissions before this Court, that whereas Defendant was now libeling him in the news section of its paper for his writings, the very same material had previously been the subject of widespread praise – in *The*

---

[1] Or rather, as Defense Counsel reminds us at Page 1 and Footnote 1 of their brief, "*The New York Times Company.*"

*New York Times*, no less.  *Id.*  To no avail: the baseless attacks continued, unabated and unashamed.

Defendant has now moved to dismiss, with the heart of is argument being a plea of opinion.  It falls short.

Under New York law, the fact/opinion analysis takes place under three elements. *Gross v New York Times Co.*, 82 NY2d 146, 153 (1993).  Those three elements are:

> "(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal . . . readers or listeners that what is being read or heard is likely to be opinion, not fact.  *Id.; Mann v Abel*, 10 NY3d 271, 276 (2008); *Davis v Boeheim*, 24 NY3d 262, 269 (2014).

As to the first element, the specific language at issue has precise meanings which are readily understood.  For example, the Merriam-Webster Dictionary defines "white nationalist" as "one of a group of militant whites who espouse white supremacy and advocate enforced racial segregation[2]" and there is no doubt that such was the meaning imparted to the words by Defendant.  *DKT. 22, ¶¶52, 101.*  Anti-Semitism is likewise precisely defined as "hostility toward or discrimination against Jews as a religious, ethnic, or racial group."[3]  "White Supremacy" is given as "a person who believes that the white race is inherently superior to other races and that white people should have control over people of other races."[4] There is nothing ambiguous about any of these terms (Defendant does not even bother to challenge other libels

---

[2] Found at https://www.merriam-webster.com/dictionary/white%20nationalist.

[3] Found at https://www.merriam-webster.com/dictionary/anti-Semitism

[4] Found at https://www.merriam-webster.com/dictionary/white%20supremacist

against Brimelow, moving only against these three and the allegation that he was running a network of fake accounts, *i.e.* what Brimelow has referred to as a "bot farm.")

Second, the charges are capable of proof one way or the other.  Contrary to Defendant's plea that proof of such charges is too vague, these and similar charges are "mundane fact[s] litigated every day in federal court." *Taylor v. Carmouche*, 214 F.3d 788, 793 (7th Cir. 2000). Numerous New York State Courts have held similar charges to be actionable.  *e.g. Schermerhorn v. Rosenberg*, 73 AD2d 276, 285 (2nd Dept, 1980); *Scott v. Cooper*, 226 AD2d 360 (2nd Dept, 1996); *Herlihy v. Metropolitan Museum of Art*, 214 AD2d 250, 261 (1st Dept, 1995); *Sheridan v. Carter*, 48 AD3d 444, 446–447 (2nd Dept, 2008).  Notably, even in the context of the much higher burden of proof applicable in criminal law, the courts have consistently acknowledged that juries can reach proof such as the motivations behind hate crimes, even where the facts supply only inferences.  *People v. Marino*, 35 AD3d 292, 293 (1st Dept, 2006); *People v. Sprately*, 152 AD3d 195, 200 (3rd Dept, 2017).  Such proof does not become too vague simply because Defendant now needs a shield for its reckless rhetoric.

Turning to the third element, we come to the most crucial and critical aspect of the analysis, for it is this factor which bears the most weight in the fact/opinion inquiry.  *Brian v Richardson*, 87 NY2d 46, 51 (1995).  Time and again the New York Court of Appeals has stressed that the context of a news article signals fact, not opinion, *e.g.* "since the articles appeared in the news section rather than the editorial or 'op ed' sections, the common expectations that apply to those more opinionated journalistic endeavors were inapplicable here." *Gross v New York Times* at 156; *see also Brian v Richardson* at 51–52. (*see also Immuno AG v Moor-Jankowski* 77NY2d, 235, 252 (1991), noting "Letters to the editor, *unlike ordinary*

*reporting*, are not published on the authority of the newspaper or journal." – emphasis supplied; *see also Mann v Abel, supra.* ).

Curiously, although Defendant invokes the New York Court of Appeals to urge dismissal (Defense Brief at pages 13–14 ), it fails to acknowledge what that court has held about items appearing in a news section.  The court has been steadfast as construing statements that appear there as fact, not opinion. *Gross v New York Times supra*., at 156; *see also, Brian v Richardson supra* at 51–52.

This is a strange omission.  Brimelow had forecast his reliance on at least some of the New York Court of Appeals' precedent in pre-motion submissions to the Court.  *DKT. 18.* Defendant's failure to even attempt to distinguish the Court of Appeals cases is a tacit concession that it cannot do so.  Notably, two the cases in question (*Gross v New York Times* and *Brian v Richardson*) involved publications in *The New York Times*, including the *Gross* case where Defendant was an actual  party.

Moreover, the offending statements appeared not in just any news articles, but in news articles published by *The New York Times*.  The pleadings make clear this is a paper which bears *gravitas* (*DKT. 22, ¶¶13, 26 and 47*); it does not present the more freewheeling atmosphere one would expect of a tabloid paper.  (*See Michel v NYP Holdings, Inc*, 816 F.3d 686, 699 (11th Cir 2016), where the Eleventh Circuit in dicta singled out *The New York Times,* along with *The Washington Post*, as the pre-eminent exemplars of factual investigative reporting.)  Then too, Defendant's articles appeared to be serious reporting, done after extended investigation, especially the first four articles in question. *Gross v New York Times supra*., at 156.

Page -4-

Even more damning, Brimelow's pleading is replete with copious detail as to *The New York Times'* own publicly proclaimed code and reputation for a strict delimitation between fact and opinion in its newspaper – fact being reserved for news articles, while opinion is permitted only in the op-ed sections (i.e. the "separation of church and state" at *The New York Times*). *DKT. 22, ¶¶15-16, 24-25.*

Defendant has not even attempted to touch any of these allegations.  Thus, any dismissal on the basis of "opinion" would do violence to precedent under both the free speech jurisprudence of the New York Court of Appeals and the standard of review under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

In any event, neither Defendant's argument for "opinion" nor any other ground for dismissal warrants sustained attention from this Court.  However, before proceeding with the rebuttal of Defendant's arguments, Brimelow must register a significant procedural objection.  Rather than confining itself to the pleadings (as it must do on a Rule 12(b) motion), Defendant has imported a miscellany of hearsay and other improper materials forbidden in this procedural posture.  Contrary to Defendant's assertion, these documents are not "integral" to Brimelow's complaint and he has not relied on them at length in framing his pleading.  The fact that Brimelow refers to one section of his website, VDARE, which explicitly addresses the question of whether he (and it) are white nationalists, does not open the door to dumping the entire archive of the website on the Court at this procedural posture.  *Chambers v Time Warner, Inc*., 282 F.3d 147, 153 (2nd Cir, 2002).  Indeed, the "sheer breadth and volume" of the materials urged by Defendant is grossly inappropriate for a Rule 12(b) motion. *Republic of Colombia v. Diageo North America Inc.*, 531 F.Supp.2d 365, 452 (EDNY, 2007).   They are clearly taken our of

context, too.  It is notable that while Defense Counsel dredges up various scare quotes from

Brimelow's <u>Alien Nation</u>, they never quite explain to the Court why that work received such

favorable mention in *The New York Times* itself.  *DKT. 22, ¶¶7–10.*  Therefore, Brimelow

objects to the numerous extraneous materials referenced at pages 2–8 of Defendant's brief.

Furthermore, Brimelow objects to the snide characterization of his views as "hateful

rhetoric" or as an "advancement of theories at the heart of white nationalism, including that there

is a scientific link between race and I.Q."  These *ad hominem* attacks are unworthy of notice by

the Court.  They are hypocritical too.  We can only say that we look forward to the day when

Defendant attempts to explains to a jury why, despite the fact that Defendant itself has published

extensively on the link between race and I.Q. (*DKT. 22, ¶36*), Brimelow was a cretin who was

justly vilified before the entire nation for "promoting theories at the heart of white nationalism" –

like the alleged scientific link between race and I.Q.  *Defense Brief at p. 1.*

POINT I: DEFENDANT CONCEDES THAT ITS ATTACKS AGAINST
BRIMELOW HAVE THE EFFECT OF STIFLING ROBUST DEBATE AND
ENFORCING TABOOS.

The First Amendment exists because we presuppose "that right conclusions are more

likely to be gathered out of a multitude of tongues, than through any kind of authoritative

selection."  *United States v. Associated Presses*, 52 F.Supp 362, 372 (SDNY 1943).  Consistent

with this purpose, the freedom of the press "was fashioned to assure the unfettered interchange of

ideas for bringing about political and social changes desired by the people."  *Roth v United

States*, 354 US 476, 484 (1957).   Of course, that freedom is perverted when the presses are used

to confine debate and enforce taboos.  Again and again, Brimelow's pleading makes clear that

that is precisely what *The New York Times* has stooped to in its repeated attacks on him, *e.g.* *DKT. 22, ¶¶31–33, 36, 47.*

These are seated facts on a Rule 12(b) motion, but it is notable that Defendant never even attempts to explain them.  This silence is more than an embarrassment.  If the chilling effect that defaming a man *merely for holding dissident ideas* has on debate has been conceded by Defendant, then the rationale for Defendant's "opinion defense" has been undercut, decisively.  If the purpose of protecting "opinion" is to ensure "a hospitable climate for the free exchange of ideas,"  then a defense based on "opinion" has no application where a defendant seeks to shield his own attempts to choke the climate.  To quote Justice Frankfurter in praise of genuine open mindedness and critical inquiry, "That our democracy ultimately rests on public opinion is a platitude of speech but not a commonplace in action. *Public opinion is the ultimate reliance of our society only if it be disciplined and responsible*."  *Wieman v. Updegraff*, 344 U.S. 183, 196 (1952) (Frankfurter concurrence) (emphasis supplied).  Defendant here makes a plea for irresponsible license.

Thus, the New York Court of Appeals' admonition from *Immuno AG v Moor-Jankowski* has special resonance on this motion: the "hypertechnical parsing" of fact from opinion should never distract from the true "objective of the entire exercise," which is to assure that the "cherished constitutional guarantee of free speech is preserved."  *Immuno AG v Moor-Jankowski*, *supra*, at 256 (1991). Put simply, intellectual witch hunts are beneath the protection of the First Amendment; indeed, they are an affront to it.

While this may seem ironic at first blush, it is not.  Indeed, it would defeat the purposes of the First Amendment to reflexively apply the usual paradigm, whereby the tort of defamation

is seen as opposed to, or chilling of, freedom of speech.  As Justice Stewart once observed of the

McCarthyism of the 1950s, "the preventive effect of liability for defamation serves an important

public purpose... Surely if the 1950's taught us anything, they taught us that the poisonous

atmosphere of the easy lie can infect and degrade a whole society."  *Rosenblatt v. Baer*, 383 US

75, 93–94 (1966) (J.Stewart, concurring).  To his words might be added the observation of

Professor Meiklejohn, who once wrote of the First Amendment: "I can only suggest that...

seeming contradictions are not real."  Alexander Meiklejohn, *The First Amendment is an

Absolute*, SUPREME COURT REVIEW (1961), 245–266, at 257.  There is no contradiction here by

roundly rejecting Defendant's hypocritical "opinion" defense.


POINT II: STATEMENTS APPEARING IN A NEWS SECTION OF WHAT IS
ARGUABLY THE MOST PRESTIGIOUS PAPER IN AMERICA ARE TO BE
CONSTRUED AS FACT, ESPECIALLY WHERE THAT PAPER HAS A
KNOWN PRACTICE OF FORBIDDING THE TAINT OF OPINION IN ITS
NEWS SECTION.

Defendant's scattered, blunderbuss argument for "opinion" is misconstrued in several

respects.  First, as applied for almost three decades now, the fact /opinion analysis takes place

under three elements cited above, not the four urged by Defendant.  *Gross v New York Times Co.*,

*supra*, at 152-153; *Mann v Abel, supra*, at 276 (2008); *Davis v Boeheim*, supra, at 269.  More

importantly, Defendant appears confused as to which element of the analysis is the most critical,

incorrectly identifying the second factor as determinative[5].  But the second factor, verifiability, is

not entitled to great weight.  It is too evasive, almost evanescent.  As one commentator put it:

---

[5] *Cf.* Defendant's brief at page 15: "The critical factor in determining whether a statement
is fact or opinion is whether it is susceptible to [sic] being proved true or false."

"The concept of verifiability, though useful in distinguishing statements of belief from statements of fact, has limited applicability. *Verifiability is not a property that either does or does not obtain. Rather, it is a property that may be present in varying degrees*." Frederick F. Schauer, *Language, Truth, and the First Amendment: An Essay in Memory of Harry Canter*, 64 VIRGINIA LAW REVIEW 263, 279 (1978) – (emphasis supplied).

Instead, the crucial factor under New York Law is the *third* factor.  *Brian v Richardson*, *supra*, at 51.  Defendant's hasty attempt to invoke the "Borzellieri cases" for its argument that even news articles can be opinion (*Borzellieri v. Daily News, LP*, 39 Misc3d 1215(A), *aff'd sub nom Silverman v. Daily News, LP*, 129 AD3d 1054 (2nd Dept, 2015), *app dism'd* 26 NY3d 962 (2015)) falls short.

First, to the extent that the "Borzellieri cases" deviate from New York Court of Appeals precedent at *Gross v New York Times* at 156; *Brian v Richardson* at 51–52; or *Immuno AG v Moor-Jankowski* at 253, they give way.  And deviate they do.  Indeed, the "Borzellieri cases" provided absolutely no attempt to reconcile their holdings with Court of Appeals precedent.  In neither decision is there any hint that precedent required considerable weight be given to the fact that the offending statements appeared in the context of news articles.  Thus, the "Borzellieri cases" cannot be reconciled with New York precedent, which is probably why neither court made any attempt to do so (the Appellate Division's opinion was particularly sparse, conclusory and poor).  To borrow a phrase from Professor Meiklejohn, "The generalizing and particularizing elements in any intellectual activity must always join forces if they are to be effective.  To think without facts is as ineffectual as to think without principles."  *Meiklejohn, supra* at 251.  This was thinking without principle.

As noted above, Defendant itself makes no attempt reconcile the dismissal it desires with precedent from the New York Court of Appeals.  Apparently, Defendant is hoping for more thinking without principle.

POINT III: THERE IS NOTHING REMOTELY ANTI-SEMITIC ABOUT THE USE OF THE WORD "KRITARCHY."  FURTHERMORE, THE NEWS ARTICLES CHARGING ANTI-SEMITISM HINTED AT UNDISCLOSED FACTS.

The Court should take judicial notice of the fact that, as a matter of law, the term "kritarchy" is simply not anti-Semitic.  It is a Greek word meaning "rule by judges."  It might be anti-judge in some contexts, but it is certainly not anti-Semitic.

For the record, neither are the words *plutarchy*, *oligarchy*, or *anarchy* anti-Semitic. Indeed, any intelligent sophomore would understand as much.  It therefore beggars the imagination that the reporters and editors of the fabled *New York Times* could ever give credence to the hysterical fit of one Ashley Tabbador, and then run her bad faith allegations (*i.e.* that the term "kritarchy" was an anti-Semitic "trope") as a news story.

That, however, is precisely what Defendant did.  *DKT. 22, ¶¶108-111.* Indeed, Defendant ran not only one bad faith story, but two.  And whereas the first news article at least contained the (thin) veneer of a debate on whether there was any anti-Semitism because of the use of the term "kritarchy", the second news article flatly declared, as a seated fact, that the blog post "contained an anti-Semitic reference."  *DKT. 22, ¶135.*  (NB: Defense Counsel have misstated the record where they assert: "None of the articles, for example, call VDARE or Brimelow anti-Semitic. Rather, the Times reported that some immigration judges thought that a blog post that was published on VDARE used anti-Semitic language." *Defendant's brief at numbered at page*

*20*.  Defendant's statement is simply not true – *see DKT. 22, ¶135.*)

Again, analyzing the three elements under New York law to distinguish fact from opinion, there is no protection for Defendant: 1) the charge of anti-Semitism has a precise meaning and is readily understood (see *Herlihy v Metropolitan Museum of Art*, supra.); 2)  it is capable of being proved true or false (Id); and 3) the offending statements again appeared in the news section of *The New York Times*.  *New York Times, supra.* at 156; *Brian v Richardson, supra*. at 51–52.  All three factors weigh in favor of Brimelow and against Defendant.

The articles are actionable for the additional reason that they hinted at undisclosed facts. In fact, the first *kritarchy* article on August 23, 2019 is full of veiled hints, while the second *kritarchy* article on September 14, 2019 linked back to the first.  *DKT. 22, ¶¶137.*

 The facts as to how Brimelow and the writers on his site have allegedly "co-opted" the term kritarchy are never set forth – though the reader is assured that the term has, in fact, been "co-opted. " *DKT. 22, ¶110 (b)*.  Likewise, no context whatsoever is supplied for Ashley Tabbador's insistence that VDARE used the term in "a pejorative manner." *DKT. 22, ¶110 (d)*. Notably, Defendant failed to provide its readers with even a hyperlink to the allegedly anti-Semitic post.  *DKT. 22, ¶124 (c)*. Nor is there any further explanation for the quote by Aryeh Tuchman that "extremists, 'mainly confined to the racist, anti-immigrant site VDare[sic], have co-opted the term to refer to liberal American judges as 'kritarchs','" or for the bald assertion that "Many of the extremists on VDare[sic] who use this term are in fact anti-Semites, and they may intentionally be using 'kritarch' as a way to express their anti-Semitism...". *DKT. 22, ¶¶110 (h)*.

If Defendant had wanted to avail itself of the opinion defense, it was incumbent to "fully and accurately set forth" all facts (*Gross v New York Times Co*, *supra*, at 155), rather than

indulge in vague references to "co-opting" a manifestly neutral term.  Having failed to do so,

Defendant cannot invoke an opinion defense.  *Milkovich v. Lorain Journal Co*, 497 US 1, 19

(1990).


POINT IV: ACCORDING BRIMELOW ALL REASONABLE INFERENCES,
STATEMENTS ABOUT VDARE IN THE SECOND, THIRD AND FIFTH
CAUSES OF ACTION ARE "OF AND CONCERNING" BRIMELOW
BECAUSE THE EXTRINSIC FACTS ARE PLAUSIBLE.


Contrary to Defendant's argument, the question of whether a statement is "of and

concerning" the plaintiff is generally a question of fact for the jury.  *Harwood Pharmacal Co. v*

*National Broadcasting Co.*, 9 NY2d 460, 462 (1961); *Brady v Ottaway Newspapers*, 84 AD2d

226, 231 (2nd Dept, 1981); *Geisler v Petrocelli*, 616 F2d 636, 640 (2nd Cir., 1980).  This renders

the question unsuitable for resolution on a Rule 12(b) motion, where the Court must accept the

allegations of the complaint as true and accord Brimelow the benefit of drawing all reasonable

inferences in his favor.  *Lynch v. City of New York*, 952 F.3d 67, 75 (2nd Cir. 2020); *Nicosia v.*

*Amazon.com, Inc.*, 834 F3d 220, 230 (2nd Cir. 2016).

To quote the New York Pattern Jury Instructions, "It is not necessary that all the world

understand the libel; it is sufficient if those who knew or knew of plaintiff can make out that the

plaintiff is the person referred to."  *New York PJI 3:25, citing, inter alia, Fetler v Houghton*

*Mifflin Co.*, 364 F2d 650 (2nd Cir., 1966); *Restatement, Second, Torts § 564, Comment (d)*.  The

extrinsic facts need only show "that it was reasonable to conclude that the publication relates to"

the plaintiff and that they were "known to those who read or heard the publication."  *Id., citing*

*Chicherchia v Cleary*, 207 AD2d 855 (2nd Dept 1994); *Three Amigos SJL Rest., Inc. v CBS News*

*Inc.*, 132 AD3d 82 (1ˢᵗ Dept 2015), *aff'd,* 28 NY3d 82 (2016).

Defense Counsel address only part of the allegations Brimelow has offered to show it was reasonable to conclude that the articles in question referred to him.  Specifically, Defendant addresses (and distorts) *only two of the nine separate allegations*: "Brimelow argues that he has 'come to be known synonymously with VDARE to the public at large' and 'is the face of VDARE,' and therefore any reference to VDARE should be a reference to him."  *Defense Brief at numbered page 19*.

But Brimelow had not rested his pleadings on those two allegations alone.  *See DKT. 22, ¶¶112–121, repeated and re-alleged at ¶¶132, 164.*  In addition, he pleaded the following allegations, none of which are even mentioned by Defendant, much less disputed:

- Plaintiff is widely known in his capacity as both the creator and editor of VDARE.
- Plaintiff is one of a small group of people who run the day to day operations of VDARE.
- Plaintiff is the editor of VDARE and is identified as such on the website.
- Furthermore, a close association between Plaintiff and VDARE is evidenced by the SPLC's website, which was referenced by Defendant in the very article in question.  For example, the SPLC's webpage devoted to VDARE prominently features two photographs of Plaintiff, who is identified as an "associated extremist" by such SPLC website.
- Plaintiff is prominently featured on VDARE's "Our Story" webpage, which informs readers that "It all started with a bold idea: in the face of unwavering hostility from the Main Stream Media, our editor, Peter Brimelow, launched VDARE.com on Christmas Eve of 1999 as an extension of his national bestselling book, Alien Nation: Common Sense About America's Immigration Disaster. After all, the issues of unrestricted mass immigration, both legal and illegal, weren't going away. They were getting bigger."
- Plaintiff's picture is displayed as the first of the small group of four people comprising "the VDARE People" on VDARE's "Our Story" webpage.  A link to VDARE's "Our Story" webpage can be found here: https://vdare.com/about

- For all practical purposes, Plaintiff is the face of VDARE, and is known as such by both friends and enemies of the VDARE site; and is easily discovered as such by following the SPLC attributions promoted and referenced by Defendant.
- Indeed, numerous individuals have noted that the August 23, 2019 attack, like the later attacks of September 13, 2019 and May 5, 2020 below, were an attack on Plaintiff.
- The statements referenced in Paragraph 110 identifies Plaintiff in such a way as to lead those who know him to understand that he was the person referred to.  *DKT. 22, ¶¶112–121.*

Defendant, once again, misrepresents Brimelow's pleading to proffer a dubious argument.  As the above allegations show, it is reasonable to conclude the articles were "of and concerning him" and that the extrinsic facts upon which that conclusion is based were known to those who read or heard the publication.  *Chicherchia v Cleary*, *supra.*; *Three Amigos SJL Rest., Inc. v CBS News Inc., supra.*

Finally, Defendant's argument that it has not accused Brimelow of running a "bot farm" or violating its 501(c)(3) status is mistaken.  "Running a bot farm" is shorthand for saying that Brimelow and VDARE engaged in "so-called 'coordinated inauthentic behavior'" and had "a network of fake accounts" designed to influence the upcoming elections.  That is precisely what the pleadings allege at *DKT. 22, ¶¶171 (a), (b), and (d).*

POINT V: HYPERLINKING TO A WEBSITE *AND* RESTATING THE DEFAMATORY MATERIAL THEREIN IS ACTIONABLE.

Addressing only the First Cause of Action, Defendant argues that it is not liable for the contents of the Southern Poverty Law Center's website merely because  it hyperlinked to the SPLC site.  (Defense Brief at page 21, *citing to Mirage Entertainment, Inc v. FEG Entretenimientos, SA*, 326 FSupp 3d 26, 39 (SDNY, 2018) and *In re Phila Newspapers, LLC*,

690 F3d 161, 175 (3rd Cir, 2012)).  Of course, this once again mis-states the issue: Defendant not only hyperlinked to the SPLC website, but repeated and endorsed the smears found on the SPLC website, to wit that Brimelow, driven by hate, was a "white nationalist."  And Defendant took such action in specific response to Brimelow's written protest that he was not a white nationalist at all, and certainly not an "open white nationalist."  *DKT. 22, ¶¶59-61.*  Thus, Defendant's actions re-urged the truth of the article in defiance of Brimelow's protest (and engaged in the "stealth edit" that violates Defendant's own ethical code).  *DKT. 22, ¶¶62-69.* This is actionable. *Enigma Software Group USA v. Bleeping Computer LLC*, 194 F.Supp.3d 263, 278–279  (SDNY 2016).

Defendant's own case law distinguishes its actions in the First Cause of Action and makes clear that their own authority does not shield it under the facts of this case:

> "Although one who republishes defamatory content may be liable... '[a] hyperlink ... does not duplicate the content of a prior publication; rather, it identifies the location of an existing publication,'.... *This can be contrasted with [cases where] republishing had been demonstrated through the defendant not only linking to previously published material, but also restating that material* (citing to Enigma Software Group USA v. Bleeping Computer LLC, 194 F.Supp.3d 263, 278 (S.D.N.Y. 2016)).  *Mirage Entertainment, Inc v. FEG Entretenimientos, SA*, *supra*. at 39 – emphasis supplied/citations omitted.

This is fully consistent with the holding of the other case urged by Defendant (*In re Phila. Newspapers*, LLC, 690 F.3d 161, 175 (3rd Cir. 2012)): mere reference to an article, *"as long as it does not restate the defamatory material*, does not republish the material." *Id.* (emphasis supplied)

But a different conclusion follows where the offending articles republish material from the hyperlink or otherwise utilizes the hyperlink to insist on the truth of the offensive statement.

*Enigma Software*, *supra*.  Crucially, the new stealth edit reproduced the libel from the SPLC

web page, which had also labeled Brimelow a "white nationalist" and explained that he falls

under the "hate" category.  The pleadings specifically allege as much. *DKT. 22, ¶69.*


POINT VI: THE CUMULATIVE ALLEGATIONS OF ACTUAL MALICE ARE
NOT ONLY PLAUSIBLE, THEY ARE OVERWHELMING.

The issue here is whether Brimelow's allegations, taken together and accorded every

favorable inference, make out a plausible claim for "actual malice."  The courts have long held

that proof of actual malice can be made by the steady accumulation of facts, and by inference

*Goldwater v Ginzburg*, 414 F2d 324, 342 (2nd Cir, 1969)).  Indeed, actual malice will often only

be capable of proof through such methods, for few will candidly acknowledge that they have

acted with knowing falsehood or reckless disregard of the truth.  *Kerik v. Tacopina*, 64 F.Supp.3d

542, 572-573 (SDNY, 2014), *quoting Biro v Conde Nast*, 963 FSupp 2d 255, 277 (SDNY, 2013),

*aff'd on other grounds*, 807 F3d 541 (2nd Cir, 2015).

Allegations such as the failure to seek corroboration from obvious sources *(Harte–Hanks*

*Communication v Connaughton*, 491 US 657, 692 (1989)); reliance on questionable sources

(Id.); publication of materials that rely on sources with a reputation for persistent inaccuracies

*Gertz v Robert Welch, Inc.*, 680 F2d 527, 538 (7th Cir, 1982), *cert denied*, 459 US 1226 (1993));

bias combined with inadequate investigation (*Church of Scientology In't v. Behar*, 238 F.3d 168,

174 (2nd Cir, 2001), *cert denied*, 534 US 814 (2001)); publication in the face of verifiable denials

*(Curran v. Phila Newspapoers, Inc.*, 376 Pa Super 508, 513 (Superior Ct PA, 1988)); adherence

in the face of contrary evidence to a pre-conceived storyline ( *Gertz v Robert Welch, Inc.*, supra.

at 539); malice in the usual sense of ill will and an *egregious* deviation from accepted

newsgathering standards ((*Harte–Hanks Communication v Connaughton*, supra. at 667–668, and Note 5) are all indications of "actual malice" in the sense intentional falsehood or reckless disregard of the truth.

Brimelow has alleged all of the above:

- He alleges failure to seek corroboration from obvious sources at *DKT 22, ¶¶57 a–c, 59, 60–61, 85, 124(a)-(b), 142(a)-(c), 156(a)-(c), 178(a)-(c).*

- He alleges reliance on questionable sources or those with a reputation for persistent inaccuracies at  *DKT 22, ¶¶37–46,  71–83, 87–96, 124(d)-(e), 142(d)-(e), 156(d).*

- He alleges bias combined with inadequate investigation at *DKT 22, ¶¶57 a–c, 59, 60–61, 62–67, 97–99, 124(g), 142(f), 156(f), 178(f).*

- He alleges publication in the face of verifiable denials at *DKT 22, ¶¶59–61, 63–86, 98, 124, 156(g), 164–169.*

- He alleges adherence in the face of contrary evidence to a pre-conceived storyline at *DKT 22, ¶¶59–61, 63–86, 98, 164–169.*

- He alleges malice in the sense of ill will at *DKT 22., ¶¶62–67, 97–99, 124(g), 156(f),164–169.*

- And he alleges an *egregious deviation* (not merely "a deviation") from accepted newsgathering standards at *DKT 22, ¶¶14–28, 58–99, 125, 143, 157.*

None of the above is implausible.  Indeed, the allegations are specific, exacting, and persuasive.

In the face of the above, Defense Counsel – once again – misstates the record and the case

law.  Instead of acknowledging that Brimelow has stated all of the above allegations in concert with each other, Defendant argues as though Brimelow had only alleged each of the above in isolation.  This is a straw man.

Defendant's proffer is confused and inconsistent, but appears to argue that deviations from journalistic standards do not evince actual malice.  Defendant then cites *Harte–Hanks Communication v Connaughton*, *supra*, at 665 for the proposition that a plaintiff must prove more than an extreme departure from professional standards to demonstrate actual malice. *Defense brief, DKT. 24 at p. 23*.  If Defendant means that Brimelow has done no more than allege a mere departure from journalistic standards, Defendant has mischaracterized the pleadings.  *e.g., DKT. 22, ¶¶14–28, 58–99, 125*.  If, however, Defendant means that *Harte–Hanks* did not include an extreme departure from journalistic standards as part of the circumstantial evidence of actual malice, then it is wrong there as well.  *Harte-Hanks* makes clear that ill will *combined with* an extreme departure from journalistic standards is sufficient to satisfy the actual malice standard.  *Harte–Hanks Communication v Connaughton*, supra. at 667-668, and Note 5.  That – and more – is what Brimelow has alleged, so Defendant's argument simply misses the point.

Defendant fares no better invoking *Biro v Conde Nast*, *supra.*  It argues that "failure to investigate is not evidence of actual malice."  *DKT, 24 at p. 23*.  But the full context of the sentence is: "the failure to investigate is not evidence of actual malice, *unless there are 'obvious reasons to doubt the veracity' of the allegedly defamatory statements*."  *Biro v Conde Nast*, supra. at 285, *citing Celle v. Filipino Reporter Enters. Inc*., 209 F.3d 163, 190 (2nd  Cir., 2000), *citing in turn St. Amant* v. Thompson, 390 U.S.727, 732 (1968) – emphasis supplied.  Here

Page -18-

Brimelow's complaint is replete with obvious reasons to doubt the veracity of the defamatory statements, including everything from the Defendant's own high praise of Brimelow for "attacking, unapologetically" the "delicate subject" of the racial aspects of immigration (*DKT. 22, ¶10*), to Defendant's own publication of the science of racial differences (*DKT. 22, ¶36*), to the clearly dishonest character of the Southern Poverty Law Center (*DKT. 22, ¶¶37–46, 87–97*), to Brimelow's repeated written denials (*DKT. 22, ¶¶59–61, 85, 165–169*).

So too with Defendant's assertion that violations of a newspaper's practices as set forth in its employee handbook will not suffice for actual malice. *DKT, 24 at p. 23, citing to Biro v Conde Nast, supra. at 286.* Again, Brimelow has specifically pled violations of Defendant's own ethical rules *along with* numerous other indicia of actual malice.

Defendant's next argument is that it should be permitted to rely on a highly questionable source such as the Southern Poverty Law Center because the "actual malice analysis focuses not on the objective quality of sources but on the subjective state to mind of the publisher." *DKT, 24 at p. 23.* This is a losing argument, certainly at the Rule 12(b) stage. Brimelow specifically alleges that Defendant's subjective state of mind was that of a conscious liar, *e.g* "...Defendant endorsed the smear of Plaintiff in its 'stealth edit' and hyperlink to the Online Article in an act of bad faith *and deliberate falsity*." *DKT. 22, ¶84.* Given the surrounding allegations, there is nothing remotely implausible about the conclusion that Defendant's subjective state of mind was that of a conscious liar. *DKT. 22, ¶¶72–84.* One eagerly awaits Defendant's explanation later in these proceeding as to why it is permitted to publish on the science of racial differences, whereas Brimelow's similar publications evince a moral failing that needed to be called to the nation's attention, repeatedly, in news articles.

Just so, the allegations of *DKT. 22, ¶¶36, 72–84* are sufficient to dispose of Defendant's supplemental argument, which is that "Brimelow does not refute any of the facts reported on the SPLC website: he does not deny that he made the statements attributed to him..."  But he did not need to.  Brimelow shows that the SPLC's *modus operandi* is, like some bugbear out of Orwell, to attack men for being thought criminals – and that Defendant knew as much.  *DKT. 22, ¶¶42–46.*  Presumably Defendant, the beneficiary the of landmark First Amendment case declaring the need for "uninhibited, robust, and wide open debate," is opposed to this in principle.  Thus, Defendant should not be in the business of paying heed to any organization that sniffs around for impure thoughts, still less waiting around for a man to protest his innocence before they refrain from defaming him for said thought crimes.

More than that, Brimelow shows that even if he made certain statements and published certain articles, such as those dealing with racial differences, so too did *The New York Times*.  If such is what it takes to constitute hate or white supremacy, then *The New York Times* is likewise guilty – and knew that it was a black pot attacking the proverbial kettle.  *DKT. 22, ¶¶36, 76–84.*  But this is absurd, and no court is bound to indulge absurdities by a party urging dismissal under Rule 12.

Defendant next argues that despite Brimelowe's disavowal, it was "free to come to its own conclusion about how to characterize Brimelow's view."  *DKT, 24 at p. 23.*  Not here; not when Defendant has made a commitment to "fairness and balance" in its news reporting, to "maintaining neutrality," to granting "an opportunity to speak in their own defense to people or organizations accused, criticized or otherwise cast in a bad light."  *DKT. 22, ¶¶15–18.*

And certainly not when *The New York Times* somehow spared itself from the odious

conclusion reserved for Brimelow despite similar (allegedly) guilty transgressions.

Next, Defendant protests that Brimelow's allegation of pre-conceived hostility is conclusory.  Again, not so: Brimelow's pleading is rife with allegations which, if true, evince pre-conceived hostility, including Defendant's staunch refusal to grant Brimelow an opportunity to "speak in his own defense" by publishing a letter to the editor, and its repeated refusal to acknowledge the "stealth edit" in contravention of its own standards.  *DKT. 22, ¶¶59, 85*. Indeed, nothing other than good old fashioned malice plausibly explains *The New York Times'* continuing jihad, which, incredibly, endured even after suit was instituted and the Court had begun to receive submissions from the parties.  *DKT. 22, ¶¶164-170.*  (Defendant also observes that "ill will, alone, does not establish actual malice."  *DKT, 24 at p. 24*.  Of course not – but the point is irrelevant in light of the other indicia of actual malice which have been pled.)

Defendant's final argument is that Brimelow is libel proof.   This argument is utterly frivolous.  To mount it, Defendant marshalls a hodge-podge of worthless hearsay, none of which is properly before this court on a Rule 12(b) motion (Brimelow objects to what Defense Counsel asserts as allegedly revealed by a Google search on page 24, as well as to each and every citation in Note 9 therein).  Having premised this dubious argument on inadmissible material, Defendant compounds its frivolity with an inapposite case: *Guccione v. Hustler Magazine, Inc.*, 800 F2d 298 (2nd Cir, 1986) was an appeal from a motion for a directed verdict after trial.  It holds no bearing whatsoever on how this Court should rule on motion seeking pre-answer dismissal under Rule 12(b).

POINT VII: THE ACTUAL MALICE STANDARD ACTUALLY
UNDERMINES FIRST AMENDMENT PRINCIPLES AND SHOULD BE
RETIRED.

In a remarkable concurrence, Justice Thomas cogently argues that the actual malice

standard of *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) should be reconsidered: "We

should not continue to reflexively apply this policy-driven approach to the Constitution... If the

Constitution does not require public figures to satisfy an actual-malice standard in state-law

defamation suits, then neither should we." *McKee v Cosby*, 139 S.Ct. 675, 676 (2019).

Justice Thomas concluded that the Constitution did not require proof of actual malice

because "Historical practice... suggests that protections for free speech and a free press—whether

embodied in state constitutions, the First Amendment, or the Fourteenth Amendment—did not

abrogate the common law of libel." *Id*. at 681.  Among the reasons mentioned are the fact that

public figures continued to bring libel actions without ever demonstrating actual malice into the

late 19th Century, that states continued to criminalize libel, including for public figures, and that

Congress, even when approving state constitutions under Reconstruction, did so with express

reference to libel laws which made no mention of any actual malice standard. *Id*.

These are cogent and persuasive arguments.  To them we would add the following: there

are many instances in which the actual malice standard actually undermines the free speech

values (i.e. "uninhibited robust and wide open debate") it is meant to shield.

Time and again, our First Amendment precedent, particularly where it intersects with

libel law, invokes fear of self-censorship.  *e.g. Smith v. California*, 361 U.S. 147, 154 (1959), or

even *New York Times Co. v. Sullivan* itself, *supra*. at 279.  Yet, to be sure, fear of libel suits is

not the only thing that leads to self-censorship.  The fear of being "condemned loudly" also leads

to self-censorship; indeed, it may be the most potent weapon on censorship in America.

Perhaps the most insightful critic of American democracy was Alexis de Tocqueville. We suggest that it is past time for de Tocqueville to make his appearance in our First Amendment jurisprudence, especially since he has been hovering, unseen as it were, whenever the courts have invoked John Stuart Mill.

Famously, de Tocqueville thought very little of freedom of speech in America. But his concerns were not centered on governmental repressions, such as formal censorship or prior restraints, let alone on the seditious libel, still less on the dangers of defamation suits. Rather, de Tocqueville saw the true threat in private agencies which exercised their powers to "condemn loudly" – precisely the kind of damage an entity such as *The New York Times* is able to inflict because if its "loud and far reaching voice." *DKT 22, ¶26.* De Tocqueville's observation on this point merits an extended quotation:

> "I know of no country in which, speaking generally, there is less independence of mind and true freedom of discussion than in America.
> "There is no religious or political theory which one cannot preach freely in the constitutional states of Europe or which does not penetrate into the others, for there is no country in Europe so subject to a single power that he who wishes to speak the truth cannot find support enough to protect him against the consequences of his independence... But in a democracy organized on the model of the United States there is only one authority, one source of strength and of success, and nothing outside it.
> "In America the majority has enclosed thought within a formidable fence. A writer is free inside that area, but woe to the man who goes beyond it. Not that he stands in fear of an auto-da-fé, but he must face all kinds of unpleasantness and everyday persecution. A career in politics is closed to him, for he has offended the only power that holds the keys. He is denied everything, including renown. Before he goes into print, he believes he has supporters; but he feels that he has them no more once he stands revealed to all, for those who condemn him express their views loudly, while those who think as he does, but without his courage, retreat into silence as if ashamed of having told the truth.
> "Formally tyranny used the clumsy weapons of chains and hangmen; nowadays even despotism, though it seemed to have nothing more to learn, has been

perfected by civilization.

"Princes made violence a physical thing, but our contemporary democratic republics have turned it into something as intellectual as the human will it is intended to constrain. Under the absolute governor of single man, despotism, to reach the soul, clumsily struck at the body, and the soul, escaping from such blows, rose gloriously above it; but in democratic republics that is not at all how tyranny behaves; it leaves the body alone and go straight for the soul.  The master no longer says: 'Think like me or you die.'  He does say: 'You are free not think as I do; you keep your life and property and all; but from this day you are a stranger among us.  You can keep your privileges in the township, but they will be useless to you, for if you solicit your fellow citizens' votes, they will not give them to you, and if you only ask for their esteem, they will make excuses for refusing that.  You will remain among men, but you will lose your rights to count as one. When you approach your fellows, they will shun you as an impure being, and even those who believe in your innocence will abandon you too, lest they in turn be shunned...'" Alexis de Tocqueville, Democracy in America, Part II, Chapter 7 "The Omnipotence of the Majority in the United States and Its Effects," Lawrence translation (Anchor Books, Doubleday & Co., 1969), pp. 254– 256.

The influence of John Stuart Mill on First Amendment jurisprudence is well known[6] and was even specifically invoked by Judge Brennan in *New York Times v Sullivan* (see 376 U.S. 254  FN 13).

John Stuart Mill, however, clearly drew on Alexis de Tocqueville when formulating his "one very simple principal" against the "tyranny of the majority" in On Liberty.[7]

Thus, when Mill argued for the value of dissent as a necessary and vitalizing corrective against the tyranny of the majority, he doubtless had in mind the stifling conformity outlined by

---

[6] *e.g.* Anthony Lewis, Make No Law: The Sullivan Case and the First Amendment, Chapter 9 "Holmes and Brandeis, Dissenting," (Random House: New York, 1991), p. 80.

[7] In his Autobiography, Mill himself credited de Tocqueville and Democracy in America with one of only two "substantial changes" that he made to his mature "mental progress."  Mill, Autobiography, (Liberal Arts Press, Inc, 1957), Chapter VI, p. 123.  After studying Democracy in America, Mill stated that: "...from this time onward my own thoughts moved more and more in the same channel, though the consequent modifications in my practical political creed were spread over many years..."  Id. p. 124.

de Tocqueville above – a conformity instilled by private power, not governmental power. The courts, and the Supreme Court in particular, seem to think that they have helped institute at least the spirit of John Stuart Mill's "one very simple principal." But it was John Stuart Mill who warned, "[when] the most active and inquiring intellects find it advisable to keep the general principles and grounds of their convictions within their own breasts the price paid for this sort of intellectual pacification is the sacrifice of the entire moral courage of the human mind."[8] Certainly Nobel Prize winner James Watson would qualify as one of our "most active and inquiring intellects." Yet as Brimelow's pleading shows, even a man of the stature of James Watson has been intimidated into silence by those who "condemn loudly" – and *The New York Times* knows it. *DKT 22, ¶34.* In this respect, extending the broad protection of the actual malice standard to those, like Defendant, who have lately turned from encouraging robust debate to enforcing intellectual orthodoxies, effects nothing so much as "the willing sacrifice of the moral courage of the human mind." This is not worthy of First Amendment protection. It is, in fact, beneath contempt. Defendant's motion should be denied.

Dated: Goshen, New York      Yours, etc.
      July 28, 2020


                    /s/ Frederick C. Kelly
                    Frederick C. Kelly, Esq. (FK1986)
                    *Attorney for Plaintiff*
                    One Harriman Square
                    Goshen, NY 10924
                    Phone No.: (845) 294-7945
                    Fax: (845) 294-7889
                    fckelylaw@gmail.com

---

[8]  Mill, <u>On Liberty</u>, 31 (Elizabeth Rapaport ed., Hackett Publ'g Co.1978).